**MARINER HEALTH CARE OF NASHVILLE, INC. d/b/a Mariner Health of Southwest Houston, Appellant,**

v.

**Gladys ROBINS, Individually and on Behalf of the Estate of Betty Battle, Deceased, Appellee.**

No. 01–08–00830–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 1, 2010.

Brian P. Johnson, Tamara M. Madden, Johnson, Trent, West & Taylor, LLP, Lauren B. Harris, Porter & Hedges LLP, Houston, TX, for Appellant.

Scot G. Dollinger, Dollinger Law, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

MICHAEL MASSENGALE, Justice.

Appellee Gladys Robins sued appellant Mariner Health Care of Nashville, Inc. Robins asserted claims for medical malpractice under the Texas Wrongful Death Act and the Texas Survival Statute, alleging that her mother, Betty Battle, suffered injuries and died due to negligent nursing home care. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 71.001–.012 (Vernon 2008) (wrongful death action); *id.* § 71.021 (survival action).

A jury found in favor of Robins only on the survival action, and the jury awarded her $750,000, which the trial court reduced to $250,000. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b) (Vernon 2005) (capping noneconomic damages at $250,000). Although other wrongful death beneficiaries were plaintiffs at trial, Robins is the sole appellee in this appeal, which pertains only to the survival action.

Mariner brings four issues on appeal: (1) Robins lacks standing or capacity to pursue claims on behalf of Battle's estate, and therefore the claims are barred by the statute of limitations; (2) the trial court abused its discretion by sustaining two challenges to peremptory strikes; (3) the evidence was legally and factually insufficient to support the jury's findings on negligence, proximate cause, and damages; and (4) the trial court improperly submit-ted to the jury a broad form question pertaining to damages.

We affirm.

## BACKGROUND

Betty Battle lived in southwest Houston with her adult sons Robert Charles Robin and Dexter Leon Battle. In addition, her adult daughters Gladys Robins, Sandra Jean McGowan, and Lucille Marie Brown lived nearby and visited frequently. Battle smoked approximately one to one-and-one-half packs of cigarettes daily.

In March 2004, Battle fell while grocery shopping and broke her hip. After undergoing hip replacement surgery at St. Luke's Hospital, she went to Mariner for rehabilitation. Her primary physician was Dr. Khoa Nguyen, who was not a Mariner employee. Dr. Nguyen testified that when Battle was admitted she did not have any pressure ulcers (also known as bedsores), but the medical records from St. Luke's indicated that she had an excoriation, or the beginning of a pressure ulcer, on her buttocks when she was transferred to Mariner. Dr. Nguyen testified that when Battle entered Mariner, she was confused but in a good mood and presented with poor nutrition and some kidney disease. While at Mariner, Battle developed anemia and stage–3 and stage–4 pressure ulcers, which were worsening. A "stage—3" pressure ulcer exists when "full thickness of skin is lost, exposing the subcutaneous tissues—presents as deep crater with or without undermining adjacent tissue." A pressure ulcer is classified as "stage 4" when "full thickness of skin and subcutaneous tissue is lost, exposing muscle or bone."

Dr. Nguyen sent Battle to Park Plaza Hospital for a blood transfusion, and from there Battle went to Select Specialty Hospital to receive care for her pressure

ulcers. She returned to Mariner, still suffering from stage-4 pressure ulcers. According to Dr. Nguyen these were, in part, the same pressure ulcers she developed during her first stay at Mariner.

Battle died on August 18, 2008 at the age of sixty-six. Dr. Nguyen listed cardiopulmonary arrest as the cause of death on Battle's death certificate, but he testified that it was not possible to determine the cause of death with certainty because no autopsy was performed.

At trial, the medical testimony centered on the pressure ulcers and the multiple other medical conditions from which Battle suffered and their effect on the healing or exacerbation of the wounds. Testimony showed that Battle suffered from hypertension, diabetes, kidney problems, dehydration, malnutrition, possible dementia, and heart problems. Some, but not all, of these conditions were known to Battle's children before her admission to Mariner.

In addition, conflicting testimony was presented about Battle's cooperation with her caregivers. For example, Dr. Nguyen testified that he had no specific memory of Battle's noncompliance, but there were notes in the medical records that she refused to be cleaned after incidents of incontinence, refused to be repositioned or insisted on staying in the same position for lengthy periods of time, refused to eat, declined to participate in physical therapy, and continued to smoke even after being told that it would hamper her healing. Robins explained that her mother's refusal to be repositioned was related to pain and that her mother did not like the food she was served.

Robins and her siblings sued Mariner for medical malpractice under the wrongful death act and survival statute. Although the pleadings stated that Robins sued "on behalf of" her mother's estate, no probate proceedings were ever initiated.

Mariner, however, did not file a verified pleading—or any pleading—contesting Robins's capacity to sue.

At trial, Mariner's counsel used four peremptory strikes to exclude four of six prospective African–American jurors. Robins's counsel asked the trial court to examine the strikes of those four veniremembers, alleging that Mariner's strikes were racially motivated. The trial court overruled the challenge as to two prospective jurors who had made statements suggesting they held biases related to the facts of the case, sustained the challenge as to the other two prospective jurors, and seated one of the challenged veniremembers on the jury.

Both Robins and Mariner presented expert testimony regarding Mariner's actions and the applicable standards of care. The evidence centered not only on Battle's pressure ulcers, but also on missing paperwork: no care plan appeared in Mariner's records for Battle's second admission.

The jury found in Mariner's favor on the wrongful-death claim and awarded $750,000 to Robins on the survival action. The trial court reduced the award to $250,000 in accordance with the statutory cap on damages. Mariner appealed.

## STANDING, CAPACITY, AND LIMITATIONS

In its first issue, Mariner contends that it is entitled to judgment as a matter of law because Robins never pleaded or proved that she has standing or capacity to assert Battle's survival claims. Mariner argues that although Robins filed suit within two years after Battle's death, her failure to demonstrate standing or capacity in the trial court means that the claims are now time barred. In response, Robins argues that Mariner has confused the issues of standing and capacity. She con-

tends that her trial testimony established her standing to sue on behalf of her mother's estate and that Mariner has waived any complaint as to her capacity to sue.

## I. Standard of Review and Applicable Law

### A. Standing and Capacity

██ A plaintiff must have both standing and capacity to bring a lawsuit. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex.2005). "Standing is a necessary component of a court's subject matter jurisdiction." *Alpert v. Riley*, 274 S.W.3d 277, 291 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444–45 (Tex.1993)). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome, whereas the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.'" *Lovato*, 171 S.W.3d at 848 (citing 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1559, at 441 (2d ed. 1990)). Separate from the issue of a party's standing, a party's capacity implicates its legal authority to file a lawsuit and pursue a particular cause of action. *Lovato*, 171 S.W.3d at 847–48. "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex.1996) (emphasis in original).

██ To demonstrate standing, a plaintiff must affirmatively show, through pleadings and other evidence pertinent to the jurisdictional inquiry, a distinct interest in the asserted conflict, such that the defendant's actions have caused the plaintiff some particular injury. *Alpert*, 274 S.W.3d at 291 (citing *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex.1984)). If a party lacks standing, a trial court lacks subject-matter jurisdiction to hear the case. *Lovato*, 171 S.W.3d at 849. Thus, standing cannot be waived and can be raised for the first time on appeal. *Id.* Because a court's subject-matter jurisdiction is a question of law, *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004), whether a plaintiff has standing is a legal question we determine de novo. *Alpert*, 274 S.W.3d at 291; *see Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998).

██ An alleged defect in capacity must be raised by a verified denial in the trial court. *Lovato*, 171 S.W.3d at 849. The failure to raise the issue of capacity through a verified plea results in waiver of that issue both at trial and on appeal. TEX.R. CIV. P. 93; *see Pledger v. Schoellkopf*, 762 S.W.2d 145, 145–46 (Tex.1988) ("When capacity is contested, Rule 93(2) requires that a verified plea be filed anytime the record does not affirmatively demonstrate the plaintiff's or defendant's right to bring suit or be sued in *whatever* capacity he is suing." (emphasis in original)); *Intracare Hosp. N. v. Campbell*, 222 S.W.3d 790, 793 n. 2 (Tex.App.-Houston [1st Dist.] 2007, no pet.) ("The Texas Rules of Civil Procedure require that a defendant challenging a plaintiff's capacity to sue raise the matter by verified pleading, if lack of capacity is not evident from the petition."). The burden is on the defendant to challenge a plaintiff's capacity to sue. *Lovato*, 171 S.W.3d at 853 n. 7; *Intracare Hosp. N.*, 222 S.W.3d at 793 n. 2.

### B. Survival Act Claim

When a person dies, all of the decedent's real and personal property become part of

an estate, including any actual or potential cause of action. TEX. PROB.CODE ANN. § 3(*l*), (z) (Vernon Supp. 2009); *Lovato*, 171 S.W.3d at 850 & n. 2. When a person dies without a will, title to the decedent's property vests immediately in his heirs, subject to the payment of debts. TEX. PROB.CODE ANN. § 37 (Vernon 2003). Thus, a personal injury action survives the death of an injured person to and in favor of the heirs, legal representatives, and estate. TEX. CIV. PRAC. & REM.CODE ANN. § 71.021 (Vernon 2008); *Lovato*, 171 S.W.3d at 849 (noting that statute abrogated common-law rule that personal injury claims do not survive death of injured person).

In *Lovato*, the plaintiff's mother died intestate after suffering from pressure ulcers she developed while a resident at Austin Nursing Center. *Lovato*, 171 S.W.3d at 846–47. Lovato filed suit on behalf of her mother's estate, purportedly as its personal representative, but at the time suit was initially filed Lovato had not filed an application for independent administration of the estate. *Id.* at 847. After limitations ran, the probate court appointed Lovato independent administrator of the estate, and Lovato amended the petition in her survival action. *Id.* The trial court granted summary judgment in favor of Austin Nursing Center based on limitations because a person with standing did not timely assert the survival action. *Id.* The court of appeals reversed, reasoning that Lovato's post-limitations amended petition related back to the time of the original filing and cured her "defective standing." *Id.*

The Texas Supreme Court wrote at length to clarify the difference between standing and capacity. *Id.* at 848–54. In a footnote, the Court distinguished its own precedents and other opinions from the courts of appeals that confused standing

with capacity, *id.* at 851 n. 3, concluding that "in a survival action, the decedent's estate has a justiciable interest in the controversy sufficient to confer standing." *Id.* at 850.

## II. Analysis

■■■ Robins asserted a survival claim in both her individual capacity as an heir and as a purported representative of Betty Battle's estate seeking recovery for both wrongful-death and survival-act claims. The survival action alleged that before her death, Battle suffered from pressure ulcers that she developed while a resident at Mariner. Immediately prior to her death, Battle was personally aggrieved by Mariner, and her potential cause of action against Mariner became part of her estate at the moment of her death. *See* TEX. PROB.CODE ANN. § 3(*l*), (z) (Vernon Supp. 2009). Under *Lovato*, Battle's estate has a justiciable interest in this controversy sufficient to confer standing. *Lovato*, 171 S.W.3d at 850.

■■■ However, Mariner also challenges Robins's capacity to bring the suit. The survival statute provides that a personal representative, administrator, or heir may sue on behalf of an estate. TEX. CIV. PRAC. & REM.CODE ANN. § 71.021(b) (Vernon 2008). "[G]enerally, personal representatives of the decedent's estate are the only people entitled to sue to recover estate property." *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex.1998); *but see Lovato*, 171 S.W.3d at 850 (distinguishing between standing and capacity). However, "[h]eirs at law can maintain a survival suit during the four-year period the law allows for instituting administration proceedings if they allege and prove that there is no administration pending and none necessary." *Shepherd*, 962 S.W.2d at 31–32.

Mariner argues that Robins did not plead and prove that administration of

Battle's estate was unnecessary. *See generally* TEX. PROB.CODE ANN. §§ 178 et seq. (Vernon Supp. 2009) (governing appointment of administrators). Mariner thus contends that Robins's failure to initiate an administration should be fatal to the survival claim. Contrary to Mariner's assertion, Robins testified at trial that no administration of her mother's estate was necessary. Robins testified that all of Battle's heirs were plaintiffs in this lawsuit, that she had been designated by the heirs to act on their behalf, that Battle died intestate, that all of Battle's debts had been paid and all of her assets had been equally divided among her heirs, that probate proceedings were not initiated, and that there was no need for an administration. *See id.* § 178(b) (administration of estate is necessary only "if two or more debts exist against the estate, or if or when it is desired to have the county court partition the estate among the distributees, or if the administration is necessary to receive or recover funds or other property due the estate").

Nevertheless, we need not resolve this issue on the merits because Mariner has waived it. Mariner did not file a verified pleading contesting Robins's capacity to bring this survival action as required by Rule of Civil Procedure 93. TEX.R. CIV. P. 93; *see Pledger*, 762 S.W.2d at 145–46. Rather than asserting this issue at a time when the trial court could have abated the case to permit Robins to initiate probate proceedings, Mariner chose to wait until the close of evidence to first raise this issue in the trial court and by urging it on appeal in support of its argument that Robins's claims are now time barred. We hold that Battle's estate had standing to sue and that Mariner waived its challenge to Robins's capacity to represent Battle's estate. We overrule Mariner's first issue.

# CHALLENGE TO PEREMPTORY STRIKES

In its second issue, Mariner challenges the trial court's action sustaining Robins's challenge as to two of Mariner's peremptory strikes.

## I. Standard of Review

In *Batson v. Kentucky,* the United States Supreme Court declared that racially motivated use of peremptory challenges in criminal cases violates due process of law and requires reversal. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Edmonson v. Leesville Concrete Co.,* the Court applied *Batson's* reasoning to civil trials. 500 U.S. 614, 618–28, 111 S.Ct. 2077, 2081–87, 114 L.Ed.2d 660 (1991); *see Goode v. Shoukfeh,* 943 S.W.2d 441, 444–45 (Tex.1997).

We review a trial court's ruling on a *Batson* challenge for abuse of discretion. *Goode,* 943 S.W.2d at 446; *Jack v. Holiday World,* 262 S.W.3d 42, 48 (Tex.App.-Houston [1st Dist.] 2008, no pet.); *Baker v. Sensitive Care–Lexington Place Health Care, Inc.,* 981 S.W.2d 753, 757 (Tex.App.-Houston [1st Dist.] 1998, no pet.). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. *Goode,* 943 S.W.2d at 446.

Resolution of a *Batson* challenge is a three-step process: (1) the party challenging the strike must establish a prima facie case of racial discrimination; (2) if the party challenging the strike does so, the striking party must come forward with a race-neutral explanation; and (3) if the striking party does so, the party challenging the strike must prove purposeful racial discrimination. *Miller–El v. Dretke,* 545 U.S. 231, 239, 125 S.Ct. 2317, 2324–25, 162 L.Ed.2d 196 (2005); *Goode,* 943 S.W.2d at 445–46.

## II. Voir Dire

During voir dire, both attorneys brought up the issue of missing paperwork or missing medical records, which was a central issue in the case. One prospective juror, who was African–American, stated that he would be biased against Mariner due to missing paperwork, although he later stated that he could be fair. Both attorneys also addressed the issue of bedsores to determine if panel members had any personal or familial experience on that subject. Another African–American veniremember stated that her mother had developed pressure sores and that they healed.

### III. Challenge to Mariner's Peremptory Strikes

After both sides exercised their peremptory strikes, Robins's counsel alleged that Mariner's strikes of four of the six African–American veniremembers were racially motivated. The trial court overruled Robins's challenge as to two prospective jurors: the one who stated that her mother had suffered from pressure ulcers that had healed and the one who stated that he had an issue with missing medical records. However, the trial court sustained Robins's challenges as to Collins, who was seated on the jury, and Williams, who was a potential alternate juror and who did not serve in any capacity.

### A. Williams

■ Because Williams was not seated as a juror or an alternate juror, the trial court's action in sustaining Robins's *Batson* challenge as to him did not affect the composition of the jury. Therefore, it could not have caused the rendition of an improper judgment or prevented Mariner from presenting its case on appeal. Even if the trial court abused its discretion in sustaining this challenge—a matter upon which we offer no opinion—any error would be harmless as a matter of law. *See*

Tex.R.App. P. 44.1(a). Therefore, we will focus our analysis on the propriety of the trial court's action regarding Collins.

### B. Collins

■ Collins did not speak at all during voir dire. After Robins's counsel made a prima facie case that Mariner's strikes were racially motivated, Mariner offered its race-neutral explanation for striking Collins. *See Miller–El,* 545 U.S. at 239, 125 S.Ct. at 2324. Mariner's counsel stated that he had excluded Collins because of her occupation and nonverbal conduct. Mariner's counsel stated that he believed that she would "be a stickler for paperwork" because she was a public school teacher. In addition, Mariner's counsel stated, "[D]uring the plaintiffs' voir dire, [she] was basically making good eye contact with plaintiffs' counsel. My sense is: She found him to be charming and amusing. I felt like—I disagree with that. I had poor eye contact with her."

At that point, the trial court had to determine if Robins had proven purposeful discrimination and if it believed Mariner's proffered explanation. *Baker,* 981 S.W.2d at 756. None of Collins's nonverbal conduct appears on the record, except as described by Mariner's counsel. Collins did not respond to the questions about paperwork, and Mariner's counsel did not specifically question her about that issue. *See Whitsey v. State,* 796 S.W.2d 707, 713–14 (Tex.Crim.App.1989); *Lott v. City of Fort Worth,* 840 S.W.2d 146, 151 (Tex.App.-Fort Worth 1992, no writ). Based upon our review of the record, we have no reason to conclude that the trial court exceeded its discretion to disbelieve Mariner's explanation for its strikes as pretextual. *See Davis v. Fisk Elec. Co.,* 268 S.W.3d 508, 518–19 (Tex.2008).

■ Moreover, even if the trial court had erred in sustaining the *Batson* chal-

lenge, we may not reverse a judgment unless we conclude that the trial court's error "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R.APP. P. 44.1(a). Here, the verdict form shows that Collins did not vote in favor of the verdict on the controlling questions of liability, comparative fault, and damages, upon which the trial court based its judgment. Because Collins apparently sided with Mariner—or believed that Robins did not prove her case—Mariner cannot show that any error of the trial court affected the judgment. Thus, we conclude that the error, if any, was harmless. *See id.*

We hold that Mariner has not shown that the trial court abused its discretion in sustaining Robins's challenge to Ms. Collins. We overrule Mariner's second issue.

## LEGAL AND FACTUAL SUFFICIENCY

In its third issue, Mariner contends that the evidence was legally and factually insufficient to support the jury's findings that Mariner was negligent, that Mariner's negligence proximately caused Battle's injuries, and that Battle suffered physical pain and mental anguish compensable by the damages award of $250,000. The jury awarded $750,000 in damages, but the trial court reduced this to $250,000 in its judgment. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.301(b) (Vernon 2005) (capping noneconomic damages in suits against health care institutions).

### I. Standard of Review

In a legal sufficiency, or "no-evidence" review, we determine whether the evidence would enable reasonable and fairminded people to reach the verdict under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

In reviewing a challenge to the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996) (citing *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986)); *Arias v. Brookstone, L.P.,* 265 S.W.3d 459, 468 (Tex.App.-Houston [1st Dist.] 2007, pet. denied).

The jury is the sole judge of witnesses' credibility; it may choose to believe one witness over another, and a reviewing court cannot impose its own opinion to the contrary. *Wilson,* 168 S.W.3d at 819; *Arias,* 265 S.W.3d at 468. Because it is the jury's province to resolve conflicting evidence, we must assume that the jury resolved all conflicts in accordance with its verdict if reasonable human beings could do so. *Wilson,* 168 S.W.3d at 819; *Arias,* 265 S.W.3d at 468.

### II. Negligence and Proximate Cause

In a medical malpractice case, the plaintiff is required to show evidence of a reasonable medical probability that the injury was proximately caused by the defendant's negligence. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995); *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). The plaintiff must prove: (1) a duty on the part of the defendant to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of the standard of care and the injury. *Ocomen v. Rubio,* 24 S.W.3d 461, 466 (Tex. App.-Houston [1st Dist.] 2000, no pet.).

The causation element of a negligence claim comprises the two following components: the cause in fact, or "substantial factor," component and the foreseeability component. *IHS Cedars Treatment Ctr. v. Mason,* 143 S.W.3d 794, 798 (Tex.2003); *Leitch v. Hornsby,* 935 S.W.2d 114, 118–19 (Tex.1996); *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992). Foreseeability requires that a person of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Doe v. Boys Clubs,* 907 S.W.2d 472, 478 (Tex.1995). Because both elements are required, a party who establishes only that an injury was foreseeable cannot prevail. *Grider v. Mike O'Brien, P.C.,* 260 S.W.3d 49, 57 (Tex. App.-Houston [1st Dist.] 2008, pet. denied).

"In a medical malpractice case, breach of the standard of care and proximate cause must be established through expert testimony." *Ocomen,* 24 S.W.3d at 466. Opinion testimony that amounts to "mere conjecture, guess, or speculation" is not sufficient. *IHS Cedars Treatment Ctr.,* 143 S.W.3d at 798–99; *Price v. Divita,* 224 S.W.3d 331, 337 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). Expert opin-ion testimony that is conclusory or speculative does not tend to make the existence of a material fact " 'more probable or less probable,' " and it is neither relevant nor competent. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 (Tex.2004) (quoting TEX.R. EVID. 401). Evidence that shows only that the defendant's alleged negligence did no more than furnish a condition that made the alleged injuries possible will not suffice to establish the substantial-factor, or cause-in-fact, component of proximate cause. *See IHS Cedars Treatment Ctr.,* 143 S.W.3d at 799.

## A. Mariner's Contentions

Mariner contends that the evidence was legally and factually insufficient to support the jury's finding that Mariner was negligent and that its negligence proximately caused Battle's injuries because (1) Dr. Lipson did not identify any specific employee who provided improper care, (2) Dr. Lipson was not qualified to testify, and (3) Dr. Lipson did not testify specifically how Mariner's alleged deficiencies caused Battle to develop pressure ulcers. We will address each of these contentions.

### a. Identification of Mariner Employees

First, Mariner argues that Dr. Lipson's testimony was insufficient because he did not identify any specific Mariner employee who provided improper care. Mariner relies on cases in which pretrial expert reports were deemed inadequate because they did not specify a specific standard of care for each of multiple defendants. *E.g., CHCA Mainland, L.P. v. Burkhalter,* 227 S.W.3d 221, 227 (Tex. App.-Houston [1st Dist.] 2007, no pet.); *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002,

no pet.); *Rittmer v. Garza,* 65 S.W.3d 718, 723 (Tex.App.-Houston [14th Dist.] 2001, no pet.). For example, in *Gray,* this Court held that an expert report was inadequate because it identified only one standard of care with respect to two separate defendants: a hospital and a doctor. *Gray,* 189 S.W.3d at 859. However, the Texas Supreme Court has held that when a party's alleged health care liability is purely vicarious, a pretrial report that adequately implicates the actions of that party's agents or employees is sufficient. *Gardner v. U.S. Imaging, Inc.,* 274 S.W.3d 669, 671 (Tex.2008) (per curiam). In *Gardner,* the plaintiff sued both the doctor and the owner and operator of the facility where the procedure was performed. *Id.* at 670. The pretrial expert report implicated only the doctor, but the plaintiffs argued that the facility's liability was purely vicarious, and the Texas Supreme Court concluded that the report was sufficient. *Id.* at 671.

In this case, Robins sued only one defendant: Mariner, a nursing home, which is a health care provider under the Civil Practice and Remedies Code. Here, Robins's theory of the case was that, although Mariner acted through its employees, it owed—and breached—certain duties to Battle that a nursing home owes its patient. Dr. Lipson testified specifically about the responsibilities and standards of care for a nursing home or "skilled nursing facility," as required by the Code of Federal Regulations. Lipson testified:

> They're required to provide for nursing care, rehabilitation care, pharmacy and dietary care, physician care. They're required to make assessments that are comprehensive, as well as renewed assessments. They're required to set up a plan of care, which is individualized and quantitative, for her. They're required to notify the family and the physician/care provider for changes in condition. They're required to follow what's

called the "rights of the resident" for dignity and other things. And they're required to have a facility that is home—like, that has a safe environment, and that basically treats people with respect—as I mentioned—and that there's good quality of life in the facility, and that various health areas are treated adequately and completely.

Based on his experience, training, and his review of the requirements in the Code of Federal Regulations, Dr. Lipson also testified about the actions a skilled nursing facility like Mariner should take in caring for a patient, such as:

> To provide for adequate nutrition and hydration; to provide a safe environment and prevent injury; to prevent skin breakdown and pressure ulcer formation; to monitor for safety and appropriateness of medications; to provide adequate medical care and oversight; to prevent recurrent or occurring infections; to prevent falls; to prevent aspiration; to prevent loss of mobility and contracture formation—basically to have a plan of care that is followed that will allow for the highest practicable level of physical, mental, and psychosocial function; to follow physician orders for the care, unless the physician is questioned by the people who are carrying out the orders—in this case, the nursing staff—and then that has to be resolved; to provide complete and accurate assessments of the health problems and disabilities, which are updated; provide adequate and complete document changes in—document changes in condition, health status, when appropriate—intake and output, vital signs, dispensing of medications and provision of treatment—to notify the charge nurse or supervisor nurse, the physician and family about changes in conditions and health status; to assess for pain and prevent it

and treat it; to monitor for changes in mental status and behavior, notify physician and family of changes; and monitor use of psychotropic medications for altered behavior and/or mental status, and side effects.

Robins's theory of recovery was not simply that Mariner was responsible for the negligence of its employees, who may have breached the standards of care for their particular professions or specialties, but that Mariner itself was negligent in carrying out its duties as a health care provider. Thus, we conclude that in order to support his opinion testimony Dr. Lipson was not required to identify specific Mariner employees who behaved negligently.

### b. Qualifications to testify about standards of care

■ Second, Mariner contends that Dr. Lipson was not qualified to testify because he did not establish any nursing qualifications and because his medical degree did not qualify him to render an opinion on nursing. Mariner did not challenge Dr. Lipson's qualifications before or during trial. Therefore, Dr. Lipson's qualifications were a matter for the jury to consider in determining the weight to give his testimony. *Cf. Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409–10 (Tex.1998).

Dr. Lipson testified that he had been a physician, researcher, and consultant for nearly 40 years. He testified that he graduated from Johns Hopkins Medical School and completed fellowships at the National Institutes of Health, Massachusetts General Hospital, Harvard Medical School, Beth Israel Hospital, and Brigham and Women's Hospital (in geriatric medicine). In addition, he worked at Harvard's skilled nursing facility and became a fellow to the Institute for Advanced Studies on Gerontology at the Ethel Percy Andrus Gerontology Center at the University of Southern California (USC). He served as medical faculty at several medical schools, teaching and lecturing in the fields of geriatric care, and he studied medication and its side effects on senior citizens at the Geriatric Research Institute. He also testified that, for 13 years, he provided quality assurance and oversight for six state-run nursing homes in Alaska, he worked as a primary caregiver in skilled nursing facilities, he set up two teaching nursing homes under the auspices of USC, and he worked as a consultant in the areas of nursing-home care and senior care for the California Department of Justice, the New Mexico Attorney General, and United States Departments of Justice and Health and Human Services, reviewing over 6,000 patient charts and visiting more than 450 nursing homes.

We conclude that a reasonable jury could have credited Dr. Lipson's testimony as that of an expert on nursing homes and geriatric care.

### c. Expert testimony should not be conjecture

Third, Mariner alleges that Dr. Lipson did not describe how Mariner's alleged deficiencies in care specifically injured Battle. Mariner also contends that Dr. Lipson's testimony was no more than testimony about "mere possibilities" and suggests that Battle's injuries would have occurred regardless of Mariner's acts or omissions. In its brief, Mariner argued, "Since the jury could only speculate as to whether Battle would have developed these decubitus ulcers, one which developed before her arrival at Mariner, and several which Mariner was able to heal before her death, there is insufficient evidence to show Mariner's conduct caused injury to Battle."

Dr. Lipson testified that Mariner was negligent in caring for Battle and that this negligence proximately caused Battle's injuries and death. Dr. Lipson testified that Mariner's negligence "caused her to develop painful, deep, necrotic pressure ulcers, which became infected. It caused her malnutrition and dehydration, and placed her at risk of renal failure." Dr. Lipson then identified specific standards of care that Mariner breached and explained how these breaches injured Battle.

Dr. Lipson testified that Mariner was required to establish a complete and comprehensive care plan for each of Battle's admissions and that it breached this standard of care because the care plan for Battle's first admission was not comprehensive and there was no care plan for Battle's second admission in Mariner's records. Dr. Lipson testified that a care plan was vital to ensure that all caregivers understand facility policies and know how to treat the patient. He further testified that the first care plan was deficient because it did not plan for hydration or aspiration control, address range-of-motion issues, or assess and coordinate her care based on her existing and foreseeable medical conditions.

Dr. Lipson testified that Mariner breached the standard of care for hydration because there was insufficient information in her medical records pertaining to intake and output and because Battle was clinically dehydrated (as shown by laboratory testing) for much of the time she resided at Mariner. He testified that dehydration, for example, could impact renal function, dementia in a senior citizen, inhibit skin healing, and increase likelihood of developing pressure ulcers. Furthermore, inadequate hydration was responsible for other medical conditions from which Battle suffered, such as diabetes and bedsores. Dr. Lipson testified that Mari-

ner's breach of the standard of care for hydration injured Battle by contributing to her urinary tract infection, her lethargy and confusion, and the development and worsening of her pressure ulcers. In addition, he testified that Mariner's breach injured Battle by putting her "at risk" for renal insufficiency and renal failure.

Dr. Lipson testified that Mariner also breached the standard of care for nutrition. He said that Mariner knew Battle suffered from protein malnutrition when she was admitted and that it had a duty to establish a diet plan to provide for adequate protein and supplementation. He testified that it failed to do so. In addition, during Battle's second admission, Mariner failed to establish a diet plan to address Battle's diabetes. Dr. Lipson opined that Mariner's breach of this standard of care injured Battle by contributing intermittently to her confusion and lethargy and by exacerbating her pressure ulcers.

Dr. Lipson also testified that Mariner breached the standard of care regarding aspiration. He testified that Mariner's records showed that Battle experienced "frank aspiration." He testified that Mariner was required to assess Battle's ability to swallow, upon admission and periodically thereafter, establish a diet for a patient experiencing dysphagia, elevate the head of her bed, and feed her in an upright position. Dr. Lipson testified that nothing in the records showed that Mariner took these steps. He concluded, "[T]here was inadequate assessment and care planning and actual hands-on care in the area of dysphagia and aspiration prevention." Dr. Lipson testified that Mariner's breach of this standard of care caused Battle to experience frank aspiration and aspiration bronchitis.

Dr. Lipson testified that Mariner was required to have ongoing pain assessment

and to manage Battle's pain with her lethargy and confusion. He opined that Mariner breached the standard of care for pain management on both admissions because the records showed no ongoing pain assessment protocol and because there were "times when [Battle] got adequate pain relief, but on the whole there was no adequate pain control program for her and Mariner allowed her to be in pain for portions of each day." For example, Dr. Lipson testified that pressure ulcers are painful and a patient would be in pain every time she was turned. According to Mariner's records, Battle sometimes received pain medication before her dressings were changed, but at other times, she did not receive medication. Dr. Lipson testified that Mariner's breach of this standard of care injured Battle not only by allowing her to experience pain but also by making her less likely to move and putting her at risk for exacerbation of her pressure ulcers. In addition, Dr. Lipson said that lack of pain management increased the risk that Battle would not eat or drink and would develop contracted extremities. Other evidence was introduced that Battle did not move for long periods of time, resisted being repositioned, and sometimes refused to eat.

Dr. Lipson testified that Mariner breached the standard of care for preventing pressure ulcers during both of Battle's admissions. He opined that "had she been treated with standard care when she first arrived at Mariner, in all reasonable medical probability her skin excoriations would have healed." He stated that Mariner was required to assess Battle's risk for skin breakdown and development or pressure ulcers in light of her contributing medical factors, like dehydration, malnutrition, and mobility. He determined that Mariner breached this standard of care because the medical records showed that Battle spent long periods of time sitting in her wheel-chair and because the records did not indicate that Battle was regularly and consistently turned or repositioned. Dr. Lipson testified that Mariner's breach of the standard of care injured Battle by allowing her skin excoriations to "develop into two stage IV necrotic-infected pressure ulcers before she left the facility for the first time" and exacerbated her pressure ulcers during her second admission. He also testified that the records showed that Battle's pressure ulcers were intermittently infected, as evidenced by notations about "necrotic" ulcers, foul odors, and blood-tinged discharge, which are signs of infection. Finally, he acknowledged that pressure sores can be clinically unavoidable, but he testified that in Battle's case they were avoidable and "their healing ... would have occurred had she gotten standard care."

Finally, Dr. Lipson testified that Mariner breached the standard of care for infection prevention. He testified that Mariner was required to have an infection-control program because Battle had an infection, Clostridium difficile (C. diff.), upon admission to Mariner. He testified that C. diff. can occur as a result of antibiotic use but that it also can spread from person to person in institutions as a result of poor hygiene. He testified that Mariner breached the standard of care by not having a documented control program for C. diff. and by not taking proper precautions to ensure that fecal matter did not contaminate her sacral pressure ulcer. Dr. Lipson testified that Mariner's breach injured Battle by allowing her to have recurrent or continual reinfection with C. diff. and by contaminating her open wounds, which could "potentially produce a systemic infection."

There was no evidence at trial that Battle suffered from sepsis (a systemic bacterial infection), and both Dr. Nguyen, Bat-

tle's treating physician, and Dr. Garcia (Mariner's expert) testified that Battle did not suffer from sepsis.

## B. Application of Standard of Review

■ Mariner contends that the evidence was legally and factually insufficient to support the jury's finding that Mariner was negligent and that Mariner's negligence proximately caused Battle's injuries because Dr. Lipson did not specifically identify any negligent Mariner employee, he was not qualified to opine on the standard of care applicable to Mariner, and he did not specifically testify how Mariner breached the standard of care but merely testified about possibilities. As discussed above, in the course of offering his opinion Dr. Lipson was not required to identify any particular Mariner employee in this suit against Mariner. Mariner did not challenge Dr. Lipson's qualification as an expert at trial, and ample evidence was introduced regarding his education, experience, and credentials regarding geriatrics and nursing homes. Finally, Dr. Lipson identified several specific standards of care that he believed were breached by Mariner, and he explained how Mariner breached the standards of care and how Mariner's breach injured Battle. Viewing the evidence in the light most favorable to the verdict, we conclude that Dr. Lipson's testimony was legally sufficient to show that Mariner breached a duty owed to Battle to act according to applicable standards of care and that these breaches injured Battle. See City of Keller, 168 S.W.3d at 827; Ocomen, 24 S.W.3d at 466.

As to factual sufficiency, we note that there is a conflict in the evidence as to Mariner's breach of the standard of care for infection prevention. Dr. Lipson testified that Mariner's breach could have potentially caused Battle to suffer from sepsis, but there was no evidence introduced at trial that she actually did suffer from sepsis and both Dr. Nguyen and Dr. Garcia, who testified for Mariner as a expert in geriatric medicine, said that Battle did not suffer from sepsis. Dr. Garcia also reviewed Battle's medical records, but Dr. Garcia concluded that Mariner did not breach the applicable standards of care and that Battle's injuries and death resulted from her medical conditions that existed before she became a resident at Mariner. Dr. Garcia also testified that Battle's smoking and lack of cooperation with staff contributed to the exacerbation of her pressure ulcers.

Mariner makes no argument that the evidence of negligence and proximate cause is factually insufficient because Dr. Lipson's testimony was outweighed by that of other expert witnesses. Rather, Mariner argues only that Dr. Lipson's testimony was insufficient. See Ocomen, 24 S.W.3d at 466 ("In a medical malpractice case, breach of the standard of care and proximate cause must be established through expert testimony."). Thus we have addressed Mariner's primary source of controverting testimony in only a summary manner.

It is the province of the jury to resolve conflicting evidence, to determine the credibility of the witnesses, and to weigh their testimony. See City of Keller, 168 S.W.3d at 819; Arias, 265 S.W.3d at 468. Thus, having reviewed the record, we conclude that the judgment was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Ortiz, 917 S.W.2d at 772; Arias, 265 S.W.3d at 468. We hold that the evidence was legally and factually sufficient to support the jury's verdict as to negligence and proximate cause.

## III. Damages and Evidence of Pain and Mental Anguish

Mariner also contends that the evidence was legally insufficient to support the jury's finding that Battle suffered pain and mental anguish compensable by $250,000. In its brief, Mariner argues first that there is no evidence or factually insufficient evidence of pain and suffering and second that there is no evidence or factually insufficient evidence of mental anguish.

## A. Broad Form Submission

When a party contends that there is no evidence to support the submission of a specific element of damages in a broad-form jury question, the party must object before the charge is read to the jury. *Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex.2002). Here, the jury was asked to award lump-sum damages for both pain and mental anguish. Mariner argues on appeal that there is no evidence to support an award either for pain and suffering or for mental anguish, but Mariner did not object to the inclusion of these elements of damages in a broad-form question before it was read to the jury. Thus, Mariner is limited to challenging the evidence to support the lump-sum award for physical pain and mental anguish. *See Brookshire Bros., Inc. v. Lewis*, 997 S.W.2d 908, 922 (Tex.App.-Beaumont 1999, pet. denied) ("[T]o successfully challenge a multi-element damage award on appeal, an appellant must address all of the elements and show the evidence is insufficient to support the entire damage award.").

## B. Pain, suffering, and mental anguish

Conscious pain and suffering may be established by circumstantial evidence. *E.g., HCRA v. Johnston*, 178 S.W.3d 861, 871 (Tex.App.-Fort Worth 2005, no pet.). Matters of pain and suffering are necessarily speculative, and it is within the province of the jury to set the amount of such damages. *Hicks v. Ricardo*, 834 S.W.2d 587, 591 (Tex.App.-Houston [1st Dist.] 1992, no writ). We give a jury's determination of the amount of damages a great deal of discretion. *Id.* (citing *Green v. Meadows*, 527 S.W.2d 496, 499 (Tex.Civ. App.-Houston [1st Dist.] 1975, writ ref'd n.r.e.)). "Once the existence of some pain and suffering has been established ... there is no objective way to measure the adequacy of the amount awarded as compensation." *Johnston*, 178 S.W.3d at 871. Put another way, "[t]he process of awarding damages for amorphous, discretionary injuries such as ... pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.*

## C. Sufficiency of the Evidence

Mariner argues, "There is simply no evidence to support the trial court's award of $250,000 for pain and suffering for Battle. No witness testified that Battle in fact experienced any pain." But Robins testified that Battle experienced pain:

Q. What was your understanding as to the primary reason why your mom was resistant to having the nursing folks move her, especially in the beginning?

A. She was in pain. And the way that they were moving her, she felt like they were hurting her.

Q. Okay. In other words, it wasn't—it wasn't a personal issue?

A. No. It was a pain issue.

Battle's treating physician testified that pressure ulcers are usually very painful, though some patients experience more pain than others. Dr. Lipson also testified about "painful" pressure ulcers and noted that Battle only sporadically received adequate pain relief. While Dr. Garcia testified that there was no evidence

that Mariner failed to manage Battle's pain adequately, she did not testify that Battle did not experience pain while residing at Mariner.

Viewing the evidence in the light most favorable to the judgment, we conclude that reasonable and fair minded people could have concluded that Battle suffered some pain as a result of the injuries sustained while residing at Mariner. *See City of Keller*, 168 S.W.3d at 827; *Johnston*, 178 S.W.3d at 871. In addition, we conclude that the judgment was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Ortiz*, 917 S.W.2d at 772; *Arias*, 265 S.W.3d at 468. We hold that the evidence was legally and factually sufficient to support the damages judgment. We overrule Mariner's third issue.

### CHARGE ERROR

■ In its fourth issue, Mariner contends that the trial court erred in submitting Question 7 of the trial court's jury charge. Questions 1 and 2 inquired about the cause of Battle's death and invited the jury to apportion responsibility between Battle and Mariner for her death. Question 6 inquired about damages related to Battle's death and was conditioned upon the jury's answers to questions 1 and 2. Questions 3 and 4 asked about the cause of Battle's injuries and invited the jury to apportion responsibility between Battle and Mariner for her injuries. Question 7 depended on the jury's answers to questions 3 and 4 and asked, "What sum of money would have fairly and reasonably compensated Betty Battle for pain and mental anguish? 'Pain and mental anguish' means the conscious physical pain and emotional pain, torment and suffering experienced by Betty Battle before her death as a result of the injury in question." Question 8 concerned punitive damages.

At the charge conference, Mariner objected to questions 1, 2, 3, and 8 on the basis that there was no evidence or legally insufficient evidence to support the submission of those issues to the jury. In addition, Mariner requested an instruction relating to questions 1 and 3 and objected to question 3 on the grounds that the plaintiffs were not entitled to recover under both wrongful death and survival theories and were not entitled to recover personal injury damages. The trial court denied Mariner's requested instruction and overruled its objections. Mariner did not object to question 7.

Mariner now argues that question 7 was improperly submitted in broad form because it commingled damages for pain and mental anguish despite an absence of evidence that Battle experienced mental anguish and because it implied that Battle died as a result of the injuries she suffered while at Mariner.

■ Objections to the charge must be presented to the trial court "before the charge is read to the jury." TEX.R. CIV. P. 272. An objection not presented to the trial court during this time is waived. *Id.*; *see also Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387, 389 (Tex.2000) (requiring that jury-charge objection be timely). "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." TEX.R. CIV. P. 274; *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex.1986).

Mariner argues that it preserved its appellate issue that question 7 was improperly submitted in broad form by objecting to question 3 on the grounds that the plaintiffs were not entitled to recover under both wrongful death and survival theories and were not entitled to recover personal injury damages. We disagree. An objection to one jury question that plaintiffs are not entitled to recover under two sepa-

rately pleaded and legally cognizable theories applicable to a nursing-home negligence case is different from an objection to a different jury question that the type of damages recoverable under two separately pleaded theories should not be submitted in broad form. Mariner's objections to question 3 did not communicate to the trial court its complaint on appeal about question 7. *See* TEX.R. CIV. P. 274; *Castleberry,* 721 S.W.2d at 276. We hold that Mariner did not preserve its jury-charge challenge, and we overrule Mariner's fourth issue.

## CONCLUSION

Having considered and overruled each of Mariner's issues, we affirm the judgment of the trial court.