NUMBER 13-08-00542-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG 
                                                                                                                      

RIO GRANDE REGIONAL HOSPITAL, INC.
AND COLUMBIA RIO GRANDE HEALTHCARE,
L.P. D/B/A RIO GRANDE REGIONAL HOSPITAL,   Appellants,
v.
 
DIANA LOPEZ VILLARREAL, INDIVIDUALLY AND
AS REPRESENTATIVE OF THE ESTATE OF HERMES
VILLARREAL, DECEASED, AND AS NEXT FRIEND OF
SARAH VILLARREAL, LAUREN VILLARREAL, AND
HERMES ALEJANDRO VILLARREAL, MINORS, AND
HERMELINDA VILLARREAL,                          Appellees.
                                                                                                                                      
 
On appeal from the 389th District Court 
 of Hidalgo County, Texas.
                                                                                                                      

  O P I N I O N

Before Chief Justice Valdez and Justices Yañez and Benavides
 Opinion by Chief Justice Valdez

          This appeal stems from a wrongful death and survival action based on a health care
liability claim brought by appellees, Diana Lopez Villarreal, individually and as
representative of the estate of Hermes Villarreal, deceased, and as next friend of Sarah
Villarreal, Lauren Villarreal, and Hermes Alejandro Villarreal, minors, and Hermalinda
Villarreal, individually, against appellants, Rio Grande Regional Hospital, Inc. and Columbia
Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital. Appellees’ cause of
action pertains to the suicide of former McAllen attorney, Hermes Villarreal, while he was
in appellants’ care. After a trial, the jury concluded that appellants were 75% responsible
for Hermes’s injuries and death and awarded damages to appellees; however, the trial
court signed a final judgment awarding appellees $685,600 in actual damages, after
applying the applicable damage caps, $43,380.98 in pre-judgment interest, and court
costs.
          By four issues, appellants argue that: (1) the record contains no evidence
establishing that appellants should have reasonably foreseen that Hermes would commit
suicide; (2) there is no evidence that the nurses’ alleged acts or omissions were a
substantial factor in bringing about Hermes’s death; (3) appellees failed to establish that
any of appellants’ actions were the cause-in-fact of Hermes’s death; and (4) the jury erred
in rejecting appellants’ affirmative defense of suicide. See Tex. Civ. Prac. & Rem. Code
Ann. § 93.001(a)(2) (Vernon 2005). On cross-appeal, appellees assert that: (1) the trial
court erred in allowing the jury to consider Hermes’s proportionate responsibility in causing
his own death; and (2) the trial court erroneously applied the $250,000 damages cap
outlined in section 74.301 of the civil practice and remedies code and, instead, should have
applied the damages cap provided in section 74.303 of the civil practice and remedies
code, which caps damages at $500,000 adjusted by the consumer price index. See id. §§
74.301, 74.303 (Vernon 2005). We affirm.
I. Background
          This dispute pertains to a jury verdict entered by a Hidalgo County jury involving the
treatment and, ultimately, the death of Hermes. Hermes was a lawyer who ran his own law
firm in Pharr, Texas. Hermes was married and had three children, Sarah, Lauren, and
Alejandro. In addition, Hermes was very close to his mother, Hermalinda, and he often
offered various forms of assistance, including money, to Hermelinda.


 By all accounts,
Hermes had a close and loving relationship with his family.
          Beginning in April 2005, Hermes began experiencing strange sensations in his ears,
insomnia, anxiety, and severe, unrelenting headaches. Hermes believed that these
maladies were related to his ear, and he complained that he felt “air coming out of one of
his ears.” Because of these symptoms, Hermes was unable to sleep, concentrate, think
clearly, and follow what people were saying, and, because he had never experienced
symptoms such as these before, he became “extremely anxious.” As a result, Hermes
scheduled an appointment with a local neurologist, Ruy Miereles, M.D. In an attempt to
determine the cause of his abnormal symptoms, Dr. Mireles recommended that Hermes
undergo an MRI on his brain. Hermes agreed, and the MRI was conducted on April 14,
2005.
          While awaiting the results of the MRI, Hermes continued to suffer anxiety, insomnia,
and severe headaches. Hermes began to consider traveling to San Antonio to seek
additional help for these symptoms. Hermes was very worried and concerned about his
health. He was described as a “type A personality” at trial and someone who was “driven,”
“self-motivated,” and did not take shortcuts. By April 16, 2005, Hermes had experienced
these symptoms for three or four days and had not slept at all. Hermes’s sister, Edna
Eckroat, testified that shortly before April 16th, she and Hermelinda met Hermes for lunch. 
At that meeting, Hermes appeared to be sleep-deprived, and he disclosed to them some
of the health problems he was having.
          In the early morning hours of April 16, 2005, Diana, Hermes’s wife, awoke to find
Hermes sitting at the kitchen table. Diana was immediately concerned because it
appeared that Hermes, once again, had failed to sleep. Hermes asked Diana to sit at the
table, and he began to explain that the symptoms were not going away and that he
intended to travel to a hospital in San Antonio to find out what was causing the symptoms. 
At this time, he handed Diana a letter, which was admitted into evidence at trial.


 Hermes
felt like he was losing his mind and suggested that he may be committed to a mental
institution in San Antonio. Diana panicked and argued that the San Antonio hospital was
too far away for her to be with him. Diana convinced Hermes to go to Rio Grande Regional
Hospital in McAllen, Texas, instead.        
A.       Hermes’s Admission to Rio Grande Regional Hospital
          Once Diana had convinced Hermes to go to Rio Grande Regional Hospital for
treatment, it was between four and five in the morning on April 16. Because the children
were asleep, Diana arranged for Hermes’s sister, Eckroat, to meet Hermes at the hospital. 
Diana agreed to join Hermes shortly thereafter, once she made arrangements for the care
of the children.
          Upon arriving at Rio Grande Regional Hospital, Hermes was admitted and attended
to by Marvin Tavarez, M.D. Hermes relayed his symptoms to Dr. Tavarez, and Dr. Tavarez
noted the complaints in Hermes’s medical records. Regarding Hermes’s initial complaints,
Dr. Tavarez testified that:
This 41-year-old male [Hermes] that [sic] was sent to the hospital because
of recurrent severe headaches. His headache had gotten so severe
especially in the past several days, three to four days, where he feels that he
passes out and all of a sudden turns black.

                                . . . .
 
                     He has to grab unto [sic] something for a few seconds and then he
feels better.

Further, Dr. Tavarez’s notes for trial, entitled “Death Summary,” indicate that:
 
[Hermes] has been extremely anxious, he is nervous, complaining that this
headache has been severe and he cannot sleep for the past 3 to 4 days. 
The patient has not slept day and night. He complains that when he goes to
the office[,] he was not able to think clearly. He is exhausted. He has been
under a lot of pressure. He is very busy. Other than this, the patient did not
have any syncopal[


]episode, although he does complain of some tingling
sensation sometimes in his face and all his extremities compatible with
hyperventilation. This patient has denied any problem with depression, etc. 
He has never expressed any problem with depression. However, in talking
to Dr. Mireles, he also never had any suggestion that the patient was
depressed.
          Dr. Tavarez admitted Hermes with a diagnosis of “[s]evere recurrent headaches,
fatigue, fainting-like spells, and questionable hyperventilation.” Dr. Tavarez admitted that
Hermes’s symptoms warranted hospitalization and noted that the hospital staff would
evaluate Hermes further. Dr. Tavarez ordered that Hermes be assigned to a private room
in the hospital. Lab work was also ordered, and Hermes was placed on a Holter
monitor—a telemetry monitor—because Hermes had complained that his heart was racing
and that he was dizzy. An EKG, otherwise known as an electrocardiogram, was also
ordered in addition to a daily dose of ten milligrams of Lexapro, an antidepressant
medication.
          Hermes was then directed to the telemetry unit, where his chest was shaved and
five EKG transmitters, which monitor the heart, were placed on his chest. These
transmitters relayed information to the nurses’ station in the hospital for further evaluation;
if the transmitters were ever removed, the equipment would immediately notify the nurses
of the disconnection.
            Once Hermes was outfitted with the EKG transmitters, Tommy Yee, M.D., a
neurologist, visited with Hermes.


 After speaking with Hermes, Dr. Yee made notes similar
to those of Dr. Tavarez regarding Hermes’s symptoms. Dr. Yee noted that there was a
family history of schizophrenia, but admitted that Hermes denied being depressed. Dr. Yee
recommended that Dr. Tavarez wait on the results of the April 15 MRI conducted by Dr.
Mireles to determine further treatment. Dr. Yee prescribed Hermes “a mild anti[-]anxiety
medication”


 and suggested that Hermes undergo a psychiatric consultation; however, Dr.
Yee stated that the necessity of the psychiatric consultation was left to Dr. Tavarez’s
discretion.
B.       Nurse Gaye Lapura Bergado’s Care of Hermes on the Evening of April 17
          At 7:00 p.m. on April 17, 2005, Gaye Lapura Bergado, R.N., began serving as
Hermes’s attending nurse. In her deposition, Nurse Bergado remembered first seeing
Hermes walking the halls of the hospital a little before 9:00 p.m. on April 17. Nurse
Bergado assessed Hermes’s health and noticed that doctors had diagnosed Hermes with
“recurrent severe headaches, anxiety, and . . . fainting spells or syncope.” Nurse Bergado
stated that Dr. Yee had conducted a psychiatric consultation with Hermes the previous day. 
Nurse Bergado recalled that Hermes was sleep-deprived given that he had not slept well
for several days. In conducting her assessment, Nurse Bergado utilized the “Glasgow
Coma Scale”


 and other measures and concluded that Hermes was strong, alert, and
required no risk-behavior precautions. Nurse Bergado also conducted an initial psychiatric
check and noted that Hermes was “alert and orientated” and was not violent, aggressive,
or destructive. Nurse Bergado admitted that Hermes’s medical records included a notation
that a “psychiatric consult” had been conducted and indicated that Hermes may have had
a “psychiatric problem.” In any event, Nurse Bergado determined that she did not need to
do any neurological assessment or management or assess Hermes’s “coping and support”
needs. Nurse Bergado testified that Hermes was “very alert” and “oriented” and that he
verbalized or expressed what he felt. At 9:00 p.m., Nurse Bergado, upon his request, gave
Hermes 0.25 milligrams of Xanex. A couple hours later, Hermes complained to Nurse
Bergado about a headache, and, after speaking with Dr. Tavarez, Nurse Bergado gave
Hermes one gram of Tylenol. 
          Hermes’s medical records reflect that at 6:00 a.m. on April 18, Nurse Bergado’s shift
was over and she was ready to give her report to the next shift nurse, Nora Munoz, R.N. 
Nurse Bergado subsequently gave her report to Nurse Munoz prior to leaving the hospital
at 7:00 a.m.


  
C.       The Results of the MRI
          At some point during the day on April 18, Dr. Mireles visited with both Hermes and
Diana at the hospital. Dr. Mireles informed Hermes and Diana of the results of the MRI,
which revealed that Hermes’s brain was functioning normally. Dr. Mireles emphasized that
Hermes needed to relax and rest. However, the results of the MRI did not comfort Hermes
because he was still concerned about his apparent inability to sleep and the recurring
headaches. In light of Hermes’s concerns, the doctors at the hospital suggested that
Hermes extend his hospital stay and plan to be discharged from the hospital on April 19. 
Hermes and Diana were both very concerned about Hermes’s symptoms, especially in light
of the fact that there was “no physical explanation.”
D.       Nurse Bergado’s Care of Hermes on the Evening of April 18
          Nurse Bergado returned to the hospital to work another shift on the evening of April
18. She testified that around 8:00 p.m., she resumed caring for Hermes. At this time,
Nurse Bergado checked Hermes’s vital signs. Nurse Bergado recalled that doctors had
included in Hermes’s medical records that the checking of his vital signs should be
discontinued while Hermes was sleeping. In addition, Hermes was not allowed any visitors
at night so that he could get some sleep. Even though doctors ordered that Hermes’s vital
signs were not to be checked while he was sleeping, appellees’ expert, Suzanne Frederick,
R.N., noted that the nurses were still required to check on Hermes throughout the night
under the applicable standard of care for nurses.
          In any event, shortly after Nurse Bergado took his vital signs, Hermes began walking
the hallways of the hospital. Nurse Bergado’s notes indicate that around 8:30 p.m. on April
18, Hermes took a shower, even though he had already previously showered earlier in the
day at 12:00 p.m. Once he finished showering at 9:00 p.m., Hermes was given one 0.25
milligram tablet of Xanex by mouth. Approximately an hour later, Hermes was given one
ten-milligram tablet of Ambien, a hypnotic that “is given to help people sleep.” This was
the first time Hermes had ever taken Ambien.


 
          Nurse Bergado believed that after taking these medications, Hermes slept until she
was summoned by Hermes for more Xanex at 2:00 a.m. on April 19. Nurse Bergado gave
Hermes another 0.25 milligram tablet of Xanex even though she was “concerned” about
the additional dosage. Nurse Bergado also acknowledged that when Hermes summoned
her at 2:00 a.m., he appeared to be very anxious and did not appear to have slept much. 
In fact, Nurse Bergado later admitted that she was unsure if Hermes had slept at all. 
Nurse Bergado testified that she checked on Hermes some time between 2:00 and 4:00
a.m. on April 19 and again at 4:00 a.m. She recalled seeing Hermes asleep at 4:00 a.m.
          At 5:00 a.m. on April 19, Hermes once again summoned Nurse Bergado. At this
time, he requested toiletries and a razor so he could shave portions of his chest where the
EKG transmitters were placed. Hermes specifically indicated to Nurse Bergado that he
wanted to shower and shave his chest himself. Nurse Bergado went to the supply room
of the hospital and retrieved various toiletries and a double-edged razor, which Nurse
Bergado testified was the same type of razor given to all patients. Upon returning to
Hermes’s room with the supplies, Nurse Bergado assisted Hermes in removing the EKG
transmitters, gave him the double-edged razor and other toiletries, and then left the room. 
Even though both Nurses Munoz and Frederick testified that it was unusual for a nurse to
allow a patient to shave his own chest and that nurses typically shave a patient’s body hair,
Nurse Bergado did not believe that Hermes’s request was odd. Moreover, Nurse Bergado
did not believe that Hermes was suicidal when she gave him the razor.
          Nurse Bergado testified in her deposition that Hermes began taking a shower a little
after 5:00 a.m. and that she should have checked to see how he was doing about an hour
later at 6:00 a.m.


 The record, however, does not indicate that Nurse Bergado checked
on Hermes again. Hermes’s medical records showed that Nurse Bergado was ready to
give her report to Nurse Munoz, the next shift nurse, at 6:00 a.m. on April 19. Upon
completing her shift at 7:00 a.m., Nurse Bergado informed Nurse Munoz that Hermes was
still in the shower and that he had indicated that he would call the nurses when he had
completed his shower. It is undisputed that no one saw Hermes from around 5:00 a.m. to
approximately 8:30 a.m., while he was purportedly in the shower.


 
          Shortly after 7:30 a.m., Nurse Munoz looked in Hermes’s room and discovered that
he was not in his bed. She later tried to open the bathroom door, but the door was locked. 
She saw a breakfast tray prepared for Hermes “just sitting there” undisturbed and uneaten. 
Nurse Munoz asked another nurse to come over and try to open the door. This second
attempt to open the bathroom door was unsuccessful, so maintenance was called to
remove the door with a screwdriver. 
          Once the bathroom door was removed, the nurses found him dead in the bathtub.


 
An investigation revealed that Hermes had horribly mutilated himself with the double-edged
razor and then bled to death over the course of a couple hours. Upon discovering Hermes
dead in the bathtub, the nurses found a suicide note that had been written by Hermes. In
this note, Hermes asked for forgiveness and noted that he had descended into madness
and that, by killing himself, he intended to spare his family the shame he associated with
commitment to a mental institution.
          Expert testimony presented by appellees described Hermes’s death as a slow
exsanguination, or bleeding to death. Appellees’ experts testified that Hermes was
probably alive as late as 8:00 a.m. and possibly 8:15 a.m., before he bled to death.


 Dr.
Tavarez stated that he believed that Hermes died at approximately 7:45 a.m.


 An autopsy
report indicated that Hermes cut himself on both sides of his neck and both arms. Robert
Charles Bux, M.D., a board-certified anatomical, clinical, and forensic pathologist and one
of appellees’ expert witnesses, testified that he believed that Hermes cut his neck first, his
left arm second, and his right arm at the elbow third. Dr. Bux believed that the cut to
Hermes’s right arm was the injury that proved to be fatal.


 
E.       The Lawsuit
          Appellees filed their original petition against appellants, among others, on August
16, 2006, asserting medical malpractice claims pertaining to Hermes’s death. Doctors
Mireles, Marvin Tavarez, Hiram Tavarez, and Yee were also named as parties to
appellees’ original petition; however, these individuals were non-suited and are not parties
to this appeal. Appellees’ live pleading, their fourth amended petition, was filed on January
16, 2008, and asserted wrongful death and medical malpractice claims against appellants
specifically and alleged that appellants were negligent in: (1) “[f]ailing to properly,
adequately and/or timely assess HERMES VILLARREAL”; (2) “[p]roviding HERMES
VILLARREAL with a double[-]edged razor”; (3) “[f]ailing to properly and timely monitor
and/or check-on HERMES VILLARREAL”; (4) “[f]ailing to provide a safe environment”; (5)
“[f]ailing to contact attending physician(s)”; (6) “[f]ailing to give a proper report to the
oncoming nurse, assigned to care for HERMES VILLARREAL”; and (7) “[v]iolating hospital
policies and procedure by failing to take suicide precautions.” Appellees also asserted that
appellants were responsible for the negligent actions of its nurses and doctors under the
theory of respondeat superior.


 Further, appellants requested damages on behalf of
Diana, Sarah, Lauren, Alejandro, and Hermelinda under the wrongful death and survival
provisions of the civil practice and remedies code. See id. §§ 71.001-.022 (Vernon 2008). 
Appellants filed three supplemental answers challenging the causation element of
appellees’ causes of action and asserting the affirmative defense of suicide. See id. §
93.001(a)(2).
          The case proceeded to trial, and after several weeks of trial, the jury concluded that
appellants were negligent in their treatment of Hermes and apportioned them 75%
responsible for Hermes’s death. The jury also concluded that Diana and Hermes were
15% and 10% responsible, respectively, and awarded appellees several million dollars in
damages. The trial court, however, reduced the jury’s damage award in accordance with 
the statutory damage caps outlined in section 74.301 of the civil practice and remedies
code. See id. § 74.301 (Vernon 2005) (capping non-economic damages for each claimant
in a health care liability claim at $250,000). The trial court’s damage award is as follows:
          •         Diana: $45,325 in non-economic damages, $110,700 in economic damages,
and $11,024.51 in pre-judgment interest for a total of $167,049.51;
 
          •         Sarah: $58,475 in non-economic damages, $78,300 in economic damages,
and $7,797.82 in pre-judgment interest for a total of $144,572.82;
 
          •         Lauren: $58,475 in non-economic damages, $78,300 in economic damages,
and $7,797.82 in pre-judgment interest for a total of $144,572.82;
 
          •         Alejandro: $58,475 in non-economic damages, $78,300 in economic
damages, and $7,797.82 in pre-judgment interest for a total of $144,572.82;
and
 
          •         Hermelinda: $29,250 in non-economic damages, $90,000 in economic
damages, and $8,963.01 in pre-judgment interest for a total of $128,213.01.

In sum, appellees were awarded $728,980.98 in damages, plus court costs and post-judgment interest. 
          Shortly thereafter, appellees filed a motion to modify and a motion for new trial,
contending that the jury incorrectly apportioned Diana 15% negligent for Hermes’s death
and that the trial court should have applied the statutory damage cap described in section
74.303 of the civil practice and remedies code rather than section 74.301. See id. §
74.303(a)-(b) (Vernon 2005) (providing that in a wrongful death or survival action on a
health care liability claim, the limit of civil liability for all damages, including exemplary
damages, is $500,000 for each claimant and this amount shall be increased or decreased
“by a sum equal to the amount of such limit multiplied by the percentage increase or
decrease in the consumer price index . . . between August 29, 1977, and the time at which
damages subject to such limits are awarded by final judgment or settlement”). Appellees
argued that by applying the section 74.303 damage cap, the trial court should have
awarded them $1,788,325 in damages.


 The record does not reflect that the trial court
ruled on appellees’ motion to modify and motion for new trial; thus, these motions were
overruled by operation of law. See Tex. R. Civ. P. 329b(c).
          Appellants filed a motion to modify and a motion for judgment notwithstanding the
verdict. Both of these motions were denied by the trial court. Appellants and appellees
both timely filed notices of appeal in this matter.
II. Legal Sufficiency
          In their first three issues, appellants challenge the legal sufficiency of the evidence
supporting the jury’s verdict. Specifically, appellants assert that the record contains no
evidence that: (1) Hermes’s suicide was foreseeable by hospital employees; (2) the
nurses’ alleged acts or omissions were a substantial factor in bringing about Hermes’s
death, or, in other words, that Hermes’s suicide was an intervening and superseding
cause; and (3) Hermes’s death was proximately caused by the breach of a legal duty owed
by appellants to Hermes. Appellees counter by arguing that it was foreseeable for hospital
employees to anticipate that some injury would occur given Hermes’s symptoms, the
medication he was taking, the fact that Nurse Bergado gave him a double-edged razor and
allowed him to shave his own chest, and the fact that no one checked on Hermes for
almost three hours on the morning of April 19. Appellees further argue that the record
reflects that: (1) appellants’ actions and omissions were a substantial factor in causing
Hermes’s death; (2) appellants owed Hermes a duty to act reasonably during his stay at
the hospital; and (3) Hermes’s suicide was not an intervening and superceding cause.
A.       Standard of Review 
          In a legal sufficiency, or “no-evidence” review, we determine whether the evidence
would enable reasonable and fair-minded people to reach the verdict under review. City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we
credit favorable evidence if a reasonable fact-finder could, and we disregard contrary
evidence unless a reasonable fact-finder could not. Id. We consider the evidence in the
light most favorable to the finding under review and indulge every reasonable inference
that would support it. Id. at 822. So long as the evidence falls within the zone of
reasonable disagreement, we may not substitute our judgment for that of the fact-finder. 
Id. The trier of fact is the sole judge of the credibility of the witnesses and the weight to
give their testimony. Id. at 819. Although we consider the evidence in the light most
favorable to the challenged findings, indulging every reasonable inference that supports
them, we may not disregard evidence that allows only one inference. Id. at 822.
          Because the jury is the sole judge of the witnesses’ credibility, it may choose to
believe one witness over another, and this Court cannot impose its own opinion to the
contrary. Id. at 819; see Arias v. Brookstone, L.P., 265 S.W.3d 459, 468 (Tex.
App.–Houston [1st Dist.] 2007, pet. denied). Further, we must assume that the jury
resolved all conflicts in accordance with its verdict if reasonable human beings could do
so. City of Keller, 168 S.W.3d at 819; Arias, 265 S.W.3d at 468.
B.       Applicable Law
          In a medical malpractice case, the plaintiff is required to show evidence of a
reasonable medical probability that the injury was proximately caused by the defendant’s
negligence. Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995); Duff v.
Yelin, 751 S.W.2d 175, 176 (Tex. 1988). The plaintiff must prove: (1) a duty on the part
of the defendant to act according to applicable standards of care; (2) a breach of the
applicable standard of care; (3) an injury; and (4) a causal connection, or proximate
causation, between the breach of the standard of care and the injury. See Ocomen v.
Rubio, 24 S.W.3d 461, 466 (Tex. App.–Houston [1st Dist.] 2000, no pet.); see also Mariner
Health Care of Nashville, Inc. v. Robins, No. 01-08-00830-CV, 2010 Tex. App. LEXIS
5114, at *21 (Tex. App.–Houston [1st Dist.] July 1, 2010, no pet.).
          In the instant case, the parties’ arguments center on the causation element. 
Proximate causation is comprised of two components: (1) the cause-in-fact or “substantial
factor”; and (2) foreseeability. Transcon. Ins. Co. v. Crump, No. 09-0005, 2010 Tex. LEXIS
616, at **28-29 (Tex. Aug. 27, 2010) (citing IHS Cedars Treatment Ctr. of Desoto, Tex.,
Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2003)); Leitch v. Hornsby, 935 S.W.2d 114, 118-19 (Tex. 1996); Travis v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992). Foreseeability
requires that a person of ordinary intelligence would have anticipated the danger caused
by the negligent act or omission. Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d
472, 478 (Tex. 1995). Foreseeability does not require that a person anticipate the precise
manner in which an injury will occur once he has created a dangerous situation through his
negligence. See Travis, 830 S.W.2d at 98. Instead, foreseeability requires only that the
general danger, not the exact sequence of events that produced the harm, be foreseeable. 
Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996); see Lee Lewis Constr., Inc. v.
Harrison, 70 S.W.3d 778, 785 (Tex. 2001). Thus, the question of foreseeability involves
a practical inquiry based upon “common experience applied to human conduct.” City of
Gladewater v. Pike, 727 S.W.2d 514, 518 (Tex. 1987) (citing Cook Consultants, Inc. v.
Larson, 700 S.W.2d 231, 236 (Tex. App.–Dallas 1985, writ ref’d n.r.e.)); see Hall v. Sonic
Drive-In of Angleton, Inc., 177 S.W.3d 636, 648-49 (Tex. App.–Houston [1st Dist.] 2005,
pet. denied). Importantly, “[f]oreseeability requires more than someone, viewing the facts
in retrospect, theorizing an extraordinary sequence of events whereby the defendant’s
conduct brings about the injury.” Boys Club of Greater Dallas, Inc., 907 S.W.2d at 478. 
          On the other hand, “[t]he test for cause-in-fact is whether the act or omission was
a substantial factor in causing the injury ‘without which the harm would not have occurred.’”
Harrison, 70 S.W.3d at 784 (quoting Boys Clubs of Greater Dallas, Inc., 907 S.W.2d at
477). Evidence that shows only that the defendant’s alleged negligence did no more than
furnish a condition that made the alleged injuries possible will not suffice to establish the
“cause-in-fact” component of proximate cause. See Mason, 143 S.W.3d at 799. 
Moreover, because both cause-in-fact and foreseeability elements are required in
establishing proximate causation, a claimant who establishes only that an injury was
foreseeable cannot prevail. See Grider v. Mike O’Brien, P.C., 260 S.W.3d 49, 57 (Tex.
App.–Houston [1st Dist.] 2008, pet. denied); see also Robins, 2010 Tex. App. LEXIS 5114,
at *22. 
          Whether a particular act of negligence is a cause-in-fact of an injury is a particularly
apt question for jury determination. Farley v. MM Cattle Co., 529 S.W.2d 751, 756 (Tex.
1975); see Tex. Dep’t of Transp. v. Pate, 170 S.W.3d 840, 848 (Tex. App.–Texarkana
2005, pet. denied). Further, the jury has broad latitude to infer proximate cause from the
evidence and the circumstances surrounding the injury-producing act, especially when it
is not possible to produce direct proof of proximate cause or lack of proximate cause. J.K.
& Susie Wadley Research Inst. & Blood Bank v. Beeson, 835 S.W.2d 689, 698 (Tex.
App.–Dallas 1992, writ denied) (citing Harris v. LaQuinta-Redbird Joint Venture, 522
S.W.2d 232, 236 (Tex. Civ. App.–Texarkana 1975, writ ref’d n.r.e.)). 
          “In a medical malpractice case, breach of the standard of care and proximate cause
must be established through expert testimony.” Ocomen, 24 S.W.3d at 466. Opinion
testimony that amounts to “mere conjecture, guess, or speculation” is not sufficient. 
Mason, 143 S.W.3d at 798-99; Price v. Divita, 224 S.W.3d 331, 337 (Tex. App.–Houston
[1st Dist.] 2006, pet. denied). Expert opinion testimony that is conclusory or speculative
does not tend to make the existence of a material fact “‘more probable or less probable,’”
and it is neither relevant nor competent. Coastal Transp. Co. v. Crown Cent. Petroleum
Corp., 136 S.W.3d 227, 232 (Tex. 2004) (quoting Tex. R. Evid. 401).  
          Proximate causation in a medical malpractice case must be based upon reasonable
medical probability, see Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex.
1995), and “[t]he quantum of proof required is simply that it is more likely than not that the
ultimate harm or condition resulted from such negligence.” Kramer v. Lewisville Mem’l
Hosp., 858 S.W.2d 397, 400 (Tex. 1993). A plaintiff is not required to exclude every other
reasonable hypothesis, see Marvelli v. Alston, 100 S.W.3d 460, 470 (Tex. App.–Fort Worth
2003, pet. denied), and more than one proximate cause may exist. Lee Lewis Constr., Inc.
v. Harrison, 70 S.W.3d 778, 784 (Tex. 2001) (determining whether the wrongful act “was
‘a’ proximate cause, not ‘the’ proximate cause” of decedent’s death).
C.       Discussion
          On appeal, appellants challenge the two components—cause-in-fact and
foreseeability—of causation pertaining to appellees’ medical malpractice claims. 
Appellants do not dispute the duty and breach elements of appellees’ cause of action. In
the trial court, the crux of appellees’ claims against appellants pertained to the failure of
hospital staff to properly assess Hermes’s psychiatric needs and Nurse Bergado’s actions
of providing Hermes a double-edged razor to shave his chest by himself and not checking
on him for approximately three hours, even though he was heavily medicated and had not
slept much due to his illness. 
          1.       Appellees’ Evidence
          At trial, Suzanne Frederick, R.N., a registered nurse with ample experience as
critical care director and nurse supervisor at several different hospitals, testified that the
standard of care for the nurses at the hospital was to: (1) closely monitor the effects of the
various medications that Hermes was taking, including those he had never taken before;
(2) assist Hermes in taking a shower so as to prevent him from falling down or fainting in
the shower; and (3) provide a safe environment, which did not include providing Hermes
with a double-edged razor to shave his chest by himself. Nurse Frederick then explained
the precautions associated with the various medications that Hermes was prescribed. In
particular, Nurse Frederick noted that Xanex and Lexapro contain warnings regarding the
potential for causing patients to commit suicide. She also noted that Hermes was
prescribed Xanex for previous headaches, but he had never taken Ambien before. She
later described the potentiating effect


 that Xanex and Ambien have, both of which cause
the depression of the central nervous system, dizziness, drowsiness, and unsteady
walking. In fact, both of these medications contain explicit instructions from the
manufacturer cautioning those who take the drugs to not operate heavy machinery. Nurse
Frederick also testified that, because of the potentiating effect of the drugs and because
Hermes had never taken Ambien before, Nurse Bergado should have assessed Hermes’s
health more regularly and monitored him for side effects. 
          Regarding Hermes’s request for a razor and a shower, Nurse Frederick stated that
Nurse Bergado should not have allowed Hermes to shower by himself given the potential
effects of the drugs on Hermes. She also stated that Nurse Bergado should have viewed
Hermes’s third shower request in the last seventeen hours as suspicious and that she
should not have allowed Hermes to shave his chest by himself. Specifically, Nurse
Frederick stated that:
This guy has anxiety. She [Nurse Bergado] testified that the reason
she gave him the Xanex was because of anxiety. Obviously[,] he hadn’t
slept hardly at all during the night, maybe a little but not much. And then he’s
asking for a razor saying it’s to shave his chest. Well, the nurses do the
shaving of the chest. Plus[,] the chest gets shaved when we put those leads
on initially. Those leads had to come off at 8:00 p.m. Those leads had to
come off at 12:00. And then one other time he had a shower during his stay,
I believe? And so it is suspicious and she should have been suspicious and
she should have worried. She should have talked to him and asked him why
do you want to do this? I’m uncomfortable with you taking a shower. Most
of all, she shouldn’t have let him to go to the shower, lock the door[,] and be
in there all by himself.
 
The standard of care is to, like the Nurse Practice Act says, is to
provide a safe environment. In the least[,] she should have asked him to
keep that shower door open, and I’m going to stand right outside this room
because I’m afraid you’re going to fall. Or she should have said, listen, it’s
five in the morning. Let’s wait until your wife gets here. Let somebody be in
there with you. She should have reasoned with him. She should have asked
him what’s going on? What are you feeling?

                     . . . .
 
She should have called a nursing supervisor. She shouldn’t have let him go
in the shower by himself. When he specifically asked for a razor, the red flag
should have gone up. 
 
. . . .
 
No. I certainly haven’t allowed a patient to shave their [sic] own chest.
 
. . . .
 
Because—and particularly in this case, this guy has all these drugs on
board in his system. Number 1, you know, the nurse knows where the leads
need to be placed. You’re going to let a guy with all these drugs be doing
this number, shaving his chest? She should be concerned he is going to cut
himself. I have never allowed a patient to shave their [sic] own chest. The
nurse does it for them[,] Nurse Munoz said the same thing.

          Later, Nurse Frederick was shown the double-edged razor that Nurse Bergado
provided to Hermes, and Nurse Frederick stated that she had not seen that type of razor
used in a hospital setting in recent history and that she would not have given Hermes any
type of razor. Nurse Frederick disagreed with Nurse Bergado’s statements that the
governing standard of care only required that she check in on Hermes about every hour. 
Nurse Frederick believed that, under the circumstances, Hermes needed to be monitored
more closely.


 Based on these factors, Nurse Frederick concluded that appellants failed
to provide a safe environment for Hermes and ultimately created a situation that led to
Hermes’s demise.
          Appellees also referenced deposition testimony by Nurse Munoz, who stated that
it was “weird” that: (1) Hermes requested a razor under the circumstances; and (2) Nurse
Bergado gave him the razor and left him alone. With regard to Hermes’s request to shave
his chest, Nurse Munoz noted that she would have helped him shave his chest rather than
allow him to do it himself. Nurse Munoz also testified that Hermes’s intense headaches,
anxiety, and insomnia could have been symptoms of depression for which appellants
apparently failed to consider or devise a neurological treatment plan. Nurse Munoz
acknowledged that if a hospital employee put a patient at risk for possible injury, then such
an act would violate the applicable standard of care. 
          Appellees called a second expert witness, Gary Michael Glass, M.D., a board-certified psychiatrist, to testify about Hermes’s mental state. Dr. Glass stated that the only
reason the drug Lexapro would have been prescribed to Hermes would be for treatment
of depression. Dr. Glass reviewed Hermes’s medical records and concluded that the
nurses at the hospital failed to do a thorough psycho-social assessment and that Hermes’s
symptoms were significant enough to require a mental-status examination, which
apparently was not conducted while Hermes was hospitalized. With respect to the double-edged razor, Dr. Glass testified that Nurse Bergado’s act in giving it to Hermes was
“absolutely, one hundred percent inappropriate and dangerous, obviously.” Dr. Glass
further opined that:
You have a man who had obvious psychiatric problems. He was admitted
to the hospital with three diagnoses, two of which were psychiatric in nature. 
The neurological consultant said this isn’t neurological, wait for the results,
but look into psychiatry for the issues. He’s on psychiatric medicines. Again,
it is the nursing staff’s responsibility to know the medicines. He’s on an anti[-]depressant and he’s on an anti[-]anxiety and he’s on a sleep aid. We don’t
do that for a hangnail. Obviously, we do this for somebody who’s anxious,
depressed[,] and has trouble sleeping. The behavior itself has not been
assessed. The gentleman took a shower earlier in the evening. He took
extra doses of medication. Why on earth would he decide at 5:00 a.m., to
want to shave his chest and take a shower. Now, conceivably there might
be legitimate reasons. I doubt it, but there could be, but no one asked him. 
No one said, hey, wait a minute, this is a little odd, number one; number two,
this man has been on these doses of medicines for a very short time and
he’s gotten an extra dose. Nurse Bergado doesn’t know or certainly hasn’t
written that he’s able to stand up, get around[,] and walk without falling over
from these medicines. He’s on a telemetry unit. He’s paying a premium to
be on a telemetry unit, because there is a consideration that there’s a serious
problem with his heart. . . . Nurse Bergado, without asking anybody or
checking with anyone or certainly not recording that, simply takes this off [the
telemetry leads] and says, go, go on into the shower.
 
. . . .
 
There’s no oversight, there’s no thought to this. Okay? . . . Unfortunately,
we’re dealing with suicide, but this man could have simply fallen and hit his
head. He could have tripped, any number of things could have happened,
separate and apart from suicide, that could have been very seriously harmful
to him, all behind that locked door, with or without a razor. 
 
. . . .
 
She [Nurse Bergado] took no pains, in fact, nobody on the staff took
any pains to investigate what clearly was a serious psychiatric ailment, and,
as a result, [Hermes is] dead.

          Dr. Glass then noted that, in his opinion, had someone checked on Hermes while
he was in the shower, he might still be alive today. Dr. Glass further noted that, in
reasonable medical probability, if the applicable standard of care had been met in this case
and had the razor not been provided by Nurse Bergado, Hermes would have survived the
hospitalization and would have been treated for his psychiatric ailments.


 
          Dr. Bux, another expert witness called by appellees, testified as to how Hermes
killed himself and concluded that, after reviewing Hermes’s medical records, he was likely
still alive as late as 8:15 a.m. on April 19. Dr. Bux noted that when Nurse Munoz allegedly
peered into Hermes’s room at 7:30 a.m., it was likely that Hermes was still alive and “most
likely salvageable.” Dr. Bux admitted on cross-examination that there is nothing in
Hermes’s medical records indicating that he had suicidal tendencies or that doctors had
ordered that Hermes be restrained for protection from himself.
          2.       Appellants’ Evidence
          On appeal, appellants argue that Hermes’s injuries and death were not foreseeable
and that the hospital’s actions were not a substantial factor in causing Hermes’s injuries
and death. Appellants first direct us to the letter that Hermes gave to Diana prior to being
hospitalized. Appellants contend that this letter conveyed Hermes’s desperation about his
mental state and that because Diana never revealed the contents of the letter, the hospital
had no idea that Hermes was affected by mental illness. Essentially, appellants contend
that Hermes and his family purposefully concealed his condition to hide any shame
associated with Hermes’s possible commitment in a mental institution. Further, appellants
assert that Hermes denied being depressed at the hospital during an initial assessment in
the emergency room and to Dr. Marvin Tavarez. Appellants direct us to Hermes’s medical
records, which are largely devoid of any documentation regarding any potential for mental
illness. The only documentation in Hermes’s medical records which may have suggested
that Hermes was suffering from mental illness was a note by Dr. Yee recommending that
Hermes undergo a psychiatric consultation. Appellants note, however, that Dr. Yee did not
order any kind of suicide prevention, nor did he note that Hermes exhibited any signs of
self-destruction. Appellants further assert that Hermes was interviewed by several doctors,
including two neurologists, during his hospitalization and that none of the doctors
documented any concern regarding depression or suicidal tendencies.


 
          Nurse Bergado testified via deposition that Hermes was generally calm and oriented
during his hospitalization and that he was able to think, interact, and function. Nurse
Bergado further testified that Hermes was alert, pleasant, and cooperative with the
attending doctors and nurses. Nurse Bergado did not recall seeing Hermes exhibit any
violent, aggressive, or destructive behaviors, including “pulling out tubes, trying to climb
over the side rails [of the bed],” when he was under her care. Nurse Bergado did admit
that the fact that Dr. Yee recommended that Hermes undergo a “psychiatric consult” might
indicate that Hermes had a “psychiatric problem.” Nevertheless, Nurse Bergado
acknowledged that she did not implement a plan to manage any potential neurological
problems that Hermes might have, which included encouraging Hermes to express his
feelings and providing “coping and support.” Nurse Bergado did not believe that such a
plan was necessary because Hermes was alert and oriented, highly intelligent, and he
regularly expressed what he felt. Nurse Bergado explained that she did not check on
Hermes while he was in the bathroom because he had told her that he would call her when
he was finished. Regarding the razor, Nurse Bergado testified that the double-edged razor
that Hermes received was the same type of razor that other hospital patients received and
that she had provided other patients with razors in the past without supervising their usage. 
          Appellants called two expert witnesses—Dr. Marvin Tavarez and Jan A. Fawcett,
M.D.—to testify on their behalf. Dr. Tavarez noted that he met Hermes at the emergency
room on April 16. Dr. Tavarez, reading from Hermes’s medical records, then testified that:
This 41-year-old white male was sent to the hospital because of
recurrence of severe headaches. His headaches had gotten so severe,
especially in the past several days, three—to—four days, where he feels that
he passes out and all of a sudden turns black. He had to grab onto
something for a few seconds and then he feels better. He had not had,
however, any apheresis, which means sweating with this. He has, however,
noted upon close questioning that occasionally he will have some
tachycardia, or fast heartbeat. Also[,] he has noticed his heart racing after
he is in bed. This will be present for [a] few minutes and after which time
becomes basically asymptomatic.

                     . . . .
 
The patient also complained he has a sensation of air coming out of
his left ear with certain movements. He has also noted that his headache is
very severe, it is all over his head but mostly in the nuchal area, which is the
back of the head. He had has headaches for many years[;] however, this
has persisted and is getting worse to where his mental acuity has
decreased. . . .  The patient has had numerous studies done before in the
past, had an MRI, CT scan of the brain, and everything has been normal,
and this patient has been evaluated by Dr. Ruy Mireles and apparently no
pathology.

Dr. Tavarez stated that Hermes was generally reluctant to take medication, even though
he had requested Xanex to help him sleep in the early morning hours of April 19. Dr.
Tavarez did the initial examination of Hermes and diagnosed him with “severe recurrent
headaches, fatigue, fainting-like spells and questionable hyperventilation.” At this time, Dr.
Tavarez prescribed Hermes the anti-depressant Lexapro, which Dr. Tavarez admitted is
used for “anxiety and depression.” Dr. Tavarez denied ever seeing Hermes exhibit any
behaviors that warranted suicide precautions. 
          On cross-examination, Dr. Tavarez acknowledged that Hermes likely “was alive” at
7:45 a.m. on April 19, which was shortly after Nurse Munoz purportedly peered into
Hermes’s room. When asked whether doctors ever came up with a diagnosis to explain
Hermes’s symptoms, Dr. Tavarez stated that doctors diagnosed Hermes with anxiety;
however, Dr. Tavarez admitted that anxiety only explained a portion of Hermes’s
symptoms. Later, Dr. Tavarez testified that Hermes appeared to be responding well to the
treatment provided and that he was scheduled to be released from the hospital later in the
day on April 19. Dr. Tavarez noted that no doctor who observed Hermes ever diagnosed
him as a risk to commit suicide and that Hermes denied being depressed.
          Dr. Fawcett, a physician and psychiatrist who has worked at the National Institute
of Mental Health and has studied suicide and depression for many years, testified that it
is very difficult to predict suicide. Dr. Fawcett opined that Hermes had anxiety attacks
dating back to 1992, and that Xanex had been prescribed previously to treat Hermes’s
anxiety. Dr. Fawcett stated that Hermes was only given 0.25 milligrams of Xanex, a
“geriatric dose,” when treated at the hospital and that she usually prescribed patients with
severe anxiety one or two milligrams of Xanex. In fact, Dr. Fawcett stated that the dosage
of Xanex given to Hermes was the “lowest prescribable [sic] dose.” She further stated that,
after reviewing Hermes’s medical records, it did not appear that Hermes exhibited a level
of anxiety that would make a reasonable person suspect that he was a suicide risk. Dr.
Fawcett then explained that headaches and difficulty in concentration are symptoms of
both depression and obstructive sleep apnea and that Hermes had been previously
diagnosed in August 2003, with possible sleep apnea. Dr. Fawcett later described the
DSM4 test that is used by psychiatrists to measure depression:
Well, I would like to just back up for a minute and tell the—I mentioned this
a little bit. But it’s very important in our society we say we’re depressed
when we feel bad, and that’s not a depression. Depression has to meet
certain criteria from that DSM4 that I mentioned. You have to either have
severe—you have to have depressed mood for two weeks constantly or
what’s called inability to experience pleasure. That means when something
happens, you win something but you don’t feel any sense of pleasure from
it, your kids no longer make you feel good. You don’t enjoy the sunset
anymore. You have no joy at all no matter what happens, even if good
things happen. You have to have one or two of those symptoms to qualify
for depression, for major depression and then you have to have five other
symptoms in addition to that, which have to do with sleep and appetite and
energy and hopelessness and suicidal thoughts and things like [that].

Dr. Fawcett did not see anything in Hermes’s record indicating that he was depressed. 
Moreover, Dr. Fawcett testified that hospital nurses checked Hermes for depression every
twelve hours and that no one, including doctors, Hermes’s wife, and Hermes’s mother,
suspected that Hermes was suffering from depression.
          Dr. Fawcett explained that Hermes was prescribed a low dose—10 milligrams—of
Lexapro and that Lexapro is approved for “generalized anxiety disorder, which is a disorder
that doesn’t—the patient isn’t depressed but has predominant recurring anxiety.” Dr.
Fawcett also recalled that neither of the two neurologists that examined Hermes noted that
he looked anxious; instead, they noted that Hermes was calm. With regard to the Ambien,
Dr. Fawcett testified that the Ambien that Hermes took was dissolved by his body within
two-and-a-half hours and that Hermes did not have any level of Xanex in his blood at the
time of his death. Finally, Dr. Fawcett stated that, based on her medical experience, she
did not believe that Hermes’s suicide was foreseeable and that “the hospital did what they
could do. . . . [H]e [Hermes] wouldn’t have told them anyway. But there’s just no—he was
determined to separate that out and keep that to himself.” 
          On cross-examination, Dr. Fawcett admitted that Hermes likely had not “completely
formed the idea of suicide” when he wrote the original letter to Diana on April 16; however,
Dr. Fawcett believed that Hermes “was desperate” at that point.


 On re-direct
examination, Dr. Fawcett stated that it was not a breach of the applicable standard of care
for Nurse Bergado to give Hermes the razor because he had successfully shaved with it
the day before. She did admit, however, that Hermes was no longer going to be on the
telemetry monitor; therefore, she implied that Nurse Bergado’s explanation for giving
Hermes the razor to shave his chest because the telemetry sensors were bothering him
was not entirely believable. 
          3.       Foreseeability
          Here, appellees’ expert witnesses testified that Hermes’s injuries and death were
foreseeable because of the actions of appellants’ employees. Specifically, appellees’
expert witnesses stated that hospital employees failed to: (1) properly assess and treat
Hermes’s psychiatric illness; (2) monitor Hermes after he took several different medications
that have a potentiating effect; (3) observe and assist Hermes in shaving his chest; and (4)
check on Hermes frequently while he was in the shower. Further, appellees’ expert
witnesses testified that it was certainly foreseeable that Hermes would be injured in some
way while he was unattended in the shower with a razor and under the influence of several
drugs at one time. The parties do not dispute that Hermes committed suicide; however,
appellees allege that the actions of hospital employees caused great danger to Hermes’s
well-being and, essentially, created a dangerous situation that led to Hermes’s injuries and
death. Clearly, in determining that appellants’ employees breached the duty of care owed
to Hermes and in awarding damages, the jury concluded that Hermes’s injuries and death
were foreseeable. We agree.
          As noted earlier, the jury was only required to find that appellants could foresee a
general danger, rather than the exact sequence of events that produced the harm. See
Harrison, 70 S.W.3d at 785; see also Walker, 924 S.W.2d at 377. Moreover, the jury was
not required to conclude that appellants could foresee the precise manner in which the
injury to Hermes occurred once the dangerous situation was created by appellants’
purported negligence. See Travis, 830 S.W.2d at 98. Thus, it was not incumbent upon
the jury to conclude that appellants could foresee that, as a result of the creation of a
dangerous situation, Hermes would commit suicide. See Harrison, 70 S.W.3d at 785; see
also Walker, 924 S.W.2d at 377. Instead, the jury needed only to conclude that by: (1)
giving Hermes a doubled-edged razor to shave his chest despite the fact that the bathroom
did not have a mirror; (2) failing to properly assess and treat Hermes’s psychiatric
condition; (3) failing to monitor the effects of the several different medications that Hermes
was taking; (4) failing to consider that Hermes was suffering from severe headaches and
anxiety which often caused him to become dizzy and unsteady; and (5) neglecting to check
on Hermes while he was in the bathroom for approximately three hours, a person of
ordinary intelligence could have anticipated that the purported negligent acts of appellants’
employees would have caused great danger to Hermes’s well-being. See Boys Clubs of
Greater Dallas, Inc., 907 S.W.2d at 478; see also Harrison, 70 S.W.3d at 785; Walker, 924
S.W.2d at 377.
          On appeal, appellants ask us to re-weigh the evidence adduced at trial and arrive
at a different conclusion or, in other words, substitute our judgment for that of the jury’s. 
Appellants direct us to various portions of the testimony provided by Nurse Bergado and
Doctors Tavarez and Fawcett that may contradict the testimony of appellees’ expert
witness and support appellants’ contention that Hermes’s injuries and death were not
foreseeable. However, as stated above, the jury is the sole judge of the witnesses’
credibility and the weight to be assigned to contrary evidence, and this court may not
impose its own opinion to the contrary. See City of Keller, 168 S.W.3d at 819; see also
Arias, 265 S.W.3d at 468. Given its verdict, the jury clearly believed the testimony
provided by appellees’ experts and rejected the testimony of appellants’ witnesses.
          In viewing the evidence in the light most favorable to the jury’s verdict and crediting
favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence
unless a reasonable fact-finder could not, we conclude that the negligent actions of
appellants’ employees about which appellees complain created a dangerous situation that
was detrimental to Hermes’s well-being. See Boys Club of Greater Dallas, Inc., 907
S.W.2d at 478; see also Harrison, 70 S.W.3d at 785; Walker, 924 S.W.2d at 377. 
Furthermore, because of the dangerous situation created by its employees, appellants
should have anticipated that Hermes would sustain some type of injury as a result of the
complained-of negligent actions committed by appellants’ employees. See Harrison, 70
S.W.3d at 785; Walker, 924 S.W.2d at 377; see also Travis, 830 S.W.2d at 98. 
          4.       Cause-In-Fact
          Although the Texas Supreme Court has stated that “‘the conduct of the defendant
may be too attentuated from the resulting injuries to the plaintiff to be a substantial factor
in bringing about the harm,’” Providence Health Ctr. v. Dowell, 262 S.W.3d 324, 329 (Tex.
2008) (quoting Mason, 143 S.W.3d at 799), we conclude, based on the facts of this case,
that appellants’ acts or omissions of: (1) failing to properly assess and treat Hermes’s
psychiatric condition and closely monitor the effects that the Xanex, Lexapro, and Ambien
medications had on Hermes; (2) giving Hermes a doubled-edged razor of the type not
commonly used in most hospitals to shave his chest by himself in the bathroom that did
not have a mirror in which Hermes could view his progress; and (3) failing to check on
Hermes for approximately three hours while he was in the shower were substantial factors
in causing Hermes’s injuries and death. Several witnesses testified that had appellants
complied with the applicable standards of care in this case, Hermes would likely still be
alive. See Harrison, 70 S.W.3d at 784; see also Boys Clubs of Greater Dallas, Inc., 909
S.W.2d at 477. Appellees’ expert witnesses testified that Hermes exhibited several
symptoms typically associated with depression, yet appellants failed to examine the
possibility of depression. Based on the record before us, we believe that Hermes’s death
could have been prevented had appellants complied with the applicable standards of care. 
          Appellants, in determining that Hermes was not suffering from a psychiatric illness,
argue that Hermes, a non-medical professional, stated that he was not depressed. 
However, Hermes’s medical records indicate that Dr. Yee recommended that Hermes
undergo a psychiatric consultation; no psychiatric consultation took place because
appellants’ employees believed that such a consultation was not necessary given that
Hermes appeared to be “alert and orientated.” 
          On appeal, appellants rely heavily on the supreme court’s holding that evidence that
demonstrates only that the defendant’s alleged negligence did no more than furnish a
condition that made the alleged injuries possible does not suffice to establish the cause-in-fact component of proximate cause. See Mason, 143 S.W.3d at 799. Based on our review
of the record, appellants’ employees did far more than simply furnish a condition that made
Hermes’s injuries possible. In relying on the supreme court’s holding in Mason, appellants
essentially argue that the sole transgression in this case is Nurse Bergado’s giving Hermes
a double-edged razor and leaving him alone to shave. See id. 
          Appellees alleged in their live pleading a system-wide failure on the part of
appellants in diagnosing, assessing, and treating Hermes’s psychiatric illness. In other
words, appellees asserted that appellants engaged in a continuing pattern of negligent
behavior that ultimately caused Hermes’s injuries. Appellees argued that appellants
ignored numerous “red flags” that signified that Hermes was suffering from some kind of
psychiatric illness, failed to provide adequate treatment for that illness, and created an
ongoing dangerous situation that endangered Hermes’s well-being and ultimately caused
his injuries and death.  
          Clearly, with its verdict, the jury, after hearing the testimony of both parties’ expert
witnesses and reviewing the trial exhibits, determined that appellants’ actions or omissions
were a substantial factor in causing Hermes’s injuries and death. See Farley, 529 S.W.2d
at 756; see also Pate, 170 S.W.3d at 848. In considering the evidence in the light most
favorable to the jury’s verdict and crediting favorable evidence if a reasonable fact-finder
could and disregarding contrary evidence unless a reasonable fact-finder could not, we
conclude that the jury was reasonable in concluding that appellants’ actions constituted a
substantial factor or, in other words, were a cause-in-fact in bringing about Hermes’s
injuries and death. See Crump, 2010 Tex. LEXIS 616, at **28-29; Mason, 143 S.W.3d at
798; see also Park Place Hosp., 909 S.W.2d at 511; Kramer, 858 S.W.2d at 400. 
          5.       Intervening and Superceding Causes
          Nevertheless, appellants argue that Hermes’s suicide was an intervening,
superseding cause which negated any causation finding. Specifically, appellants contend
that “‘[w]here an action is brought under a wrongful death statute[,] the general rule is that
suicide constitutes an intervening force which breaks the line of causation from the
wrongful act to the death and therefore the wrongful act does not render defendant civilly
liable.’” Exxon Corp. v. Brecheen, 526 S.W.2d 519, 523 (Tex. 1975) (quoting Annotation,
Civil Liability for Death by Suicide, 11 A.L.R. 751 (1950)); see Shell Oil Co. v. Humphrey,
880 S.W.2d 170, 174 (Tex. App.–Houston [14th Dist.] 1994, writ denied). 
          The supreme court has recently stated that “[i]f the act or omission alleged to have
been a new and independent cause is reasonably foreseeable at the time of the
defendant’s alleged negligence, the new act or omission is a concurring cause as opposed
to a superseding or new and independent cause.” Columbia Rio Grande Healthcare, L.P.
v. Hawley, 284 S.W.3d 851, 857 (Tex. 2009) (citing Dew v. Crown Derrick Erectors, Inc.,
208 S.W.3d 448, 451 (Tex. 2006) (plurality opinion)). “A new and independent cause
alters the natural sequence of events, produces results that would not otherwise have
occurred, is an act or omission not brought into operation by the original wrongful act of the
defendant, and operates entirely independently of the defendant’s allegedly negligent act
or omission.” Id. (citing Dew, 208 S.W.3d at 451). In analyzing whether an intervening
cause is new and independent, rather than superceding, the supreme court has applied
the various factors set forth in section 442 of the Restatement (Second) of Torts, which
provide:
(a) the fact that its intervention brings about harm different in kind from that
which would otherwise have resulted from the actor’s negligence;
(b) the fact that its operation or the consequences thereof appear after the
event to be extraordinary rather than normal in view of the circumstances
existing at the time of its operation;
(c) the fact that the intervening force is operating independently of any
situation created by the actor’s negligence, or, on the other hand, is or is not
a normal result of such a situation;
(d) the fact that the operation of the intervening force is due to a third
person’s act or to his failure to act;
(e) the fact that the intervening force is due to an act of a third person that
is wrongful toward the other and as such subjects the third person to liability
to him; [and]
(f) the degree of culpability of a wrongful act of a third person which sets the
intervening force in motion. 
Id. (citing Restatement (Second) of Torts § 442 (1965)); see Humble Oil & Ref. Co. v.
Whitten, 427 S.W.2d 313, 315 (Tex. 1968) (adopting the section 442 factors); see also
Cowart v. Kmart Corp., 20 S.W.3d 779, 784 (Tex. App.–Dallas 2000, pet. denied).
          On the other hand, Texas courts have held that more than one action may be the
proximate cause of the same injury. Wilson v. Brister, 982 S.W.2d 42, 44 (Tex.
App.–Houston [1st Dist.] 1998, pet. denied) (citing Brookshire Bros., Inc. v. Lewis, 911
S.W.2d 791, 793 (Tex. App.–Tyler 1995, writ denied)). The negligence of one does not
excuse the negligence of another and where both the actor’s negligent conduct and that
of a third person bring about the injury, the rule of concurrent causation applies. Id. (citing
Atchison v. Tex. & Pac. Ry., 143 Tex. 466, 186 S.W.2d 228, 231 (1945); Lewis, 911
S.W.2d at 793; Restatement (Second) of Torts § 439 (1977)). The rule of concurrent
causation provides that all persons who contribute to the injury are liable. Id. (citing Berry
Prop. Mgmt., Inc. v. Bliskey, 850 S.W.2d 644, 655 (Tex. App.–Corpus Christi 1993, writ
dism’d by agr.)). “The intervention of an unforeseen cause of injury does not necessarily
mean there is a new and independent cause of such character as to constitute a
superceding cause which will relieve a defendant from liability.” Brownsville Med. Ctr. v.
Gracia, 704 S.W.2d 68, 73 (Tex. App.–Corpus Christi 1985, writ ref’d n.r.e.). The
intervening cause of the plaintiff’s injury, even if unforeseeable, may be a concurring cause
if the chain of causation flowing from the defendant’s original negligence is continuous and
unbroken. Wilson, 982 S.W.2d at 44 (citing Bell v. Campbell, 434 S.W.2d 117, 122 (Tex.
1968); Henry v. Houston Lighting & Power Co., 934 S.W.2d 748, 753 (Tex. App.–Houston
[1st Dist.] 1996, writ denied)); see Gracia, 704 S.W.2d at 73. 
          On appeal, appellants urge us to apply the section 442 factors of the Restatement
(Second) of Torts to conclude that Hermes’s suicide was an intervening and superseding
cause of the injuries alleged in this case.


 However, we have already concluded that the
record established that Hermes’s injuries and death were foreseeable. Therefore, in
applying supreme court precedent, Hermes’s suicide, at best, would be considered a
concurrent cause. See Hawley, 284 S.W.3d at 857; see also Dew, 208 S.W.3d at 451
(stating that “[a] new and independent cause is one that intervenes between the original
wrong and the final injury such that the injury is attributed to the new cause rather than the
first and more remote cause” and that a superseding cause can be distinguished from a
concurrent cause if the injury that is the intervening force is both unforeseeable and its
consequences are unexpected, meaning it produces results that would not otherwise have
occurred); Robert R. Walker, Inc. v. Burgdorf, 150 Tex. 603, 244 S.W.2d 506, 509 (1951). 
Thus, we do not believe that Hermes’s suicide “‘operated entirely independently’” of the
ongoing negligent actions of appellants’ employees so that the suicide may be construed
as superseding. See Dew, 208 S.W.3d at 451 (quoting 1 J.D. Lee & Barry A. Lindahl,
Modern Tort Law § 4:7 at 4-14-4-15 (2d ed. 2002)); see also Hawley, 284 S.W.3d at 859
(“[W]here the risk resulting from the intervening act is the same risk resulting from the
original actor’s negligence, the intervening act cannot be classified as a superseding
cause.”). Thus, because appellants contributed to Hermes’s demise, they cannot escape
liability in this case. See Dew, 208 S.W.3d at 450. 
          Additionally, appellants rely on the Humphrey case out of the Houston Fourteenth
Court of Appeals to support its contention that Hermes’s suicide was an intervening and
superceding cause. While the Humphrey court did mention the general proposition of law
that suicide constitutes an intervening force, breaking the line of causation, the court
further explained that: 
          Where the wrongful act, however, produces a rage or frenzy that the
person injured by defendant’s wrongful act destroys himself during such rage
or frenzy, or in response to an uncontrollable impulse, the act is . . .
considered as within and a part of the line of causation from defendant’s
wrongful act to the suicide and defendant’s act is held to be the proximate
cause of the death. 
880 S.W.2d at 174 (internal citations and quotations omitted). The Humphrey court also
referenced section 323 of the Second Restatement of Torts, which provides that:
One who undertakes, gratuitously or for consideration, to render
services to another which he should recognize as necessary for the
protection of the other’s person or things, is subject to liability to the other for
physical harm resulting from his failure to exercise reasonable care to
perform his undertaking if[:]
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other’s reliance upon the
undertaking.
Id. at 176 (quoting Restatement (Second) of Torts § 323 (1965)). 
          We find these statements to be noteworthy because appellants have argued at trial
and on appeal that Hermes likely was contemplating suicide prior to hospitalization; thus,
according to appellants, Hermes ostensibly had latent suicidal ideations. Such an
argument is not persuasive because, assuming this argument is true, appellants’ ongoing
negligent actions directed towards Hermes triggered the so-called latent suicidal ideations
and therefore caused Hermes to commit suicide. In addition, the record establishes that
the negligent actions of appellants’ employees increased the risk of harm to Hermes, and
Hermes relied upon appellants to treat his ailments. See Humphrey, 880 S.W.2d at 176;
see also Restatement (Second) of Torts § 323. Therefore, based on the foregoing,
appellants should not be allowed to escape liability for causing Hermes’s injuries and
death. See Humphrey, 880 S.W.2d at 174, 176; see also Restatement (Second) of
Torts § 323. We therefore conclude that Hermes’s act of committing suicide does not rise
to the level of intervening and superceding cause; instead, this act constitutes a concurrent
cause that does not absolve appellants of liability in this matter. See Hawley, 284 S.W.3d
at 857; Dew, 208 S.W.3d at 451; see also Gracia, 704 S.W.2d at 73.  
          Based on the foregoing, we conclude that the evidence supporting the jury’s verdict
is legally sufficient. See City of Keller, 168 S.W.3d at 822, 827. Accordingly, we overrule
appellants’ first three issues on appeal.
III. The Affirmative Defense of Suicide and Appellee’s Cross-Issue as to
Proportionate Responsibility

          In their fourth issue, appellants argue that the jury’s verdict is not supported by
legally sufficient evidence because appellants established the affirmative defense of
suicide as a matter of law. Specifically, appellants complain about the jury’s implicit
rejection of its suicide affirmative defense. Appellees contend that the jury should not have
been allowed to consider Hermes’s conduct of committing suicide because his suicide was
caused by appellants’ failure to comply with applicable legal standards. By their first cross-issue, appellees argue that the trial court erred in allowing the jury to consider Hermes’s
proportionate responsibility in causing his own death because appellants’ section 93.001
affirmative defense may not be applied given that appellants failed to comply with
applicable legal standards and “section 93.001 unambiguously and expressly trumps
application of section 33.001.” See Tex. Civ. Prac. & Rem. Code Ann. § 33.001 (Vernon
2008). 
A.       Applicable Law 
 
           Section 93.001(a)(2) of the civil practice and remedies code provides that it is an
affirmative defense to a civil action for damages for personal injury or death if the plaintiff,
at the time the cause of action arose, was:
committing or attempting to commit suicide, and the plaintiff’s conduct in
committing or attempting to commit suicide was the sole cause of the
damages sustained; provided, however, if the suicide or attempted suicide
was caused in whole or in part by a failure on the part of any defendant to
comply with an applicable legal standard, then such suicide or attempted
suicide shall not be a defense.
Tex. Civ. Prac. & Rem. Code Ann. § 93.001(a)(2) (emphasis added). Texas Rule of Civil
Procedure 94 requires that an affirmative defense be pleaded. Tex. R. Civ. P. 94. The
burden of pleading and proving the elements of an affirmative defense is on the party
seeking to rely on that defense. See id.; Quantum Chem. Corp. v. Toennies, 47 S.W.3d
473, 481 (Tex. 2001); Compass Bank v. MFP Fin. Servs., Inc., 152 S.W.3d 844, 851 (Tex.
App.–Dallas 2005, pet. denied); see also West v. Hamilton, No. 07-07-0235-CV, 2008 Tex.
App. LEXIS 7694, at **4-5 (Tex. App.–Amarillo Oct. 9, 2008, no pet.). To conclusively
prove an affirmative defense, a party must have “‘so conclusively proved each element of
[that] affirmative defense . . . that there was no fact question to submit to the jury on any
of its elements.’” Kupchynsky v. Nardiello, 230 S.W.3d 685, 697 (Tex. App.–Dallas 2007,
pet. denied) (quoting Brown v. Zimmerman, 160 S.W.3d 695, 702 (Tex. App.–Dallas 2005,
no pet.)). “A matter is conclusively established if ordinary minds could not differ as to the
conclusion to be drawn from the evidence.” Id. A party is not entitled to a jury issue on its
affirmative defense unless it pleads and proves it. Tricon Tool & Supply, Inc. v. Thumann,
226 S.W.3d 494, 501 (Tex. App.–Houston [1st Dist.] 2006, pet. denied) (citing Freeman
v. Carroll, 499 S.W.2d 668, 670 (Tex. Civ. App.–Tyler 1973, writ ref’d n.r.e.)). 
          If an appellant challenges the legal sufficiency of an adverse finding on an issue on
which it had the burden of proof—here, the affirmative defense of suicide—it must
demonstrate on appeal that the evidence conclusively established all vital facts in support
of the issue. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); accord Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 340 (Tex. 1998); see Thumann, 226
S.W.3d at 501. In reviewing such a matter-of-law challenge, we employ a two-part test. 
See Pac. Employers Inc. Co. v. Dayton, 958 S.W.2d 452, 455 (Tex. App.–Fort Worth 1997,
pet. denied) (citing Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 940 (Tex. 1991)). 
First, we examine the record for evidence supporting the finding, while ignoring all evidence
to the contrary. See Dow Chem. Co., 46 S.W.3d at 241. If there is not any evidence to
support the finding, the reviewing court examines the entire record to determine whether
the contrary proposition is established as a matter of law. See id. If the contrary
proposition is established conclusively, then the evidence supporting the jury’s decision is
legally insufficient and appellant’s issue is sustained. See id.
B.       Appellants’ Suicide Affirmative Defense
          Here, appellants assert that the jury should have rendered a take-nothing verdict
because Hermes committed suicide and their actions were not the cause of Hermes’s
suicide. We have already concluded that the jury’s determination that appellants engaged
in an ongoing pattern of negligent behavior that endangered Hermes’s well-being and
caused Hermes’s injuries and death was supported by legally sufficient evidence. Because
of this conclusion, we cannot say that appellants have sustained their burden of
conclusively establishing all vital facts in support of their suicide affirmative defense. See
Dow Chem. Co., 46 S.W.3d at 241; Martinez, 977 S.W.2d at 340; see also Thumann, 226
S.W.3d at 501. Moreover, section 93.001(a)(1) itself states that suicide “shall not be a
defense” if “the suicide or attempted suicide was caused in whole or in part by a failure on
the part of any defendant to comply with an applicable legal standard.” Tex. Civ. Prac. &
Rem. Code Ann. § 93.001(a)(2); see Alvarado v. City of Brownsville, 865 S.W.2d 148, 153-154 (Tex. App.–Corpus Christi 1993), rev’d on other grounds, 897 S.W.2d 750 (Tex. 1995). 
Therefore, based on the foregoing, we reject appellants’ contention that the jury’s verdict
is not supported by legally sufficient evidence because they established their suicide
affirmative defense as a matter of law. See id.; see also Dow Chem. Co., 46 S.W.3d at
241; Martinez, 977 S.W.2d at 340; Thumann, 226 S.W.3d at 501. Accordingly, we overrule
appellants’ fourth issue.
C.       Hermes’s Proportionate Responsibility
          Proportionate responsibility under chapter 33 of the civil practice and remedies code
provides that “a claimant may not recover damages if his percentage of responsibility is
greater than 50 percent.” Tex. Civ. Prac. & Rem. Code Ann. § 33.001. Chapter 33 applies
to “any cause of action based in tort in which a defendant, settling person, or responsible
third party is found responsible for a percentage of the harm for which relief is sought.” Id.
§ 33.002(a)(1) (Vernon 2008). Further, in determining the percentage of responsibility, the
trier of fact must also consider, among other things, the responsibility of the claimant and
other responsible third parties in causing or contributing in any way to the harm for which
the recovery of damages is sought. Id. § 33.003(a). 
          On appeal, appellees argue that the jury improperly considered whether Hermes’s
actions constituted “negligence aside from the very act of committing suicide.”


 The
record reflects that Hermes believed he had descended into madness and that he made
a “weird” request to shower and shave at 5:00 a.m. on April 19, even though he had
showered twice before in the previous seventeen hours. Several expert witnesses testified
that Hermes had a psychiatric condition that appellants neglected to properly assess and
treat. However, prior to committing suicide, Hermes left a suicide note, which suggests that
Hermes may have considered and contemplated suicide at some point before he actually
carried it out. 
          The supreme court has stated that a jury may “consider the conduct of [a] patient
when determining proportionate responsibility as a part of an inclusive comparative
negligence scheme rather than compartmentaliz[ing] negligence in rigid categories.” 
Jackson v. Axelrad, 221 S.W.3d 650, 654 (Tex. 2007); see Dowell, 262 S.W.3d at 333
(Wainwright, J., concurring); see also Tex. Civ. Prac. & Rem. Code Ann. §§ 33.001-.003. 
In Dowell, the decedent, Lance, a nineteen-year-old male, was admitted for treatment at
a local hospital after threatening to kill himself. 262 S.W.3d at 325. Lance was distraught
over his girlfriend threatening to leave him. Id. at 325-26. He had made similar threats
in the past and had been previously admitted to the hospital for treatment. Id. While at the
hospital, nurses and doctors failed to make a comprehensive assessment of Lance’s risk
of suicide. Id. at 326. Lance told doctors that he was not suicidal, and, because he was
an adult and did not desire to be hospitalized, doctors released him pursuant to a no-suicide contract, which provided that Lance would go to the local Mental Health and Mental
Retardation Center (“MHMR”) for assessment and stay with his family until the assessment
was completed. Id. at 326-27. Lance agreed, and the hospital discharged him shortly
thereafter. Id. at 327. After being discharged, Lance went to a family reunion and
attended a rodeo with his brother. Id. However, thirty-three hours after being discharged
and not having visited the local MHMR center, Lance hung himself. Id.
          The jury found that the hospital was negligent and assessed $400,000 in damages
for Lance’s parents and $400,000 in damages for Lance’s estate. Id. at 327-28. The court
of appeals affirmed the jury’s verdict. Id. at 328. However, the supreme court reversed,
holding that Lance could not have been hospitalized against his will given the
circumstances and that the hospital’s discharge of Lance did not proximately cause his
death. Id. at 328-30. The majority opinion did not discuss the interplay between chapter
33 and section 93.001 of the civil practice and remedies code.


 
          In a concurrence, Justice Wainwright, however, did consider the interplay between
those statutory provisions and noted that “[i]f [the decedent’s] actions apart from the act
of committing suicide violated an applicable standard of care (such as negligence), a jury
should have weighed such actions in assigning proportionate responsibility.” Id. at 332
(Wainwright, J., concurring). Justice Wainwright noted that a jury could have concluded
that Lance failed to follow the no-suicide contract and that the failure to follow that contract
contributed to his death; therefore, Justice Wainwright concluded that Lance engaged in
actions apart from the actual commission of suicide that were negligent and, thus, partially
caused the complained-of injuries. Id. (Wainwright, J., concurring). Under these
circumstances, Justice Wainwright determined that the jury could have been instructed
about the proportionate responsibility statutes. Id. at 332-33 (Wainwright, J., concurring). 
          On the other hand, Justice O’Neill’s dissent in Dowell pointed out that to “attribute
causation for breach of a mental health standard of care to the patient whose undiagnosed
mental impairment was the very cause of injury” would be “clearly contrary to the statute’s
[section 93.001(a)(2)] intent.” Id. at 337 (O’Neill, J., dissenting). Justice O’Neill also stated
that Justice Wainright’s suggestion that the jury consider negligent actions taken by the
decedent apart from committing suicide was untenable because:
Under such an approach, a fact[-]finder would have to somehow separate
Lance’s suicide from the events leading to his suicide. However, I find it
unlikely that, in drafting the statute, the Legislature intended parties who
breached the standard of care to be absolved from liability because the act
of isolating one’s self in order to commit suicide is somehow separable from
the act of suicide itself. Notwithstanding the difficulties inherent in requiring
the fact[-]finder to divorce actions leading to suicide from the actual event,
there is no factual support for such a submission in this case.
Id. at 336 (O’Neill, J., dissenting).
          We agree with Justice O’Neill’s analysis as applied in this case because the
negligent actions of appellants’ employees were ongoing and Hermes’s suicide flowed from
those actions. Moreover, it is noteworthy that Hermes committed suicide while still in the
care of appellants’ employees, not thirty-three hours after being released by a health care
provider. See id. at 325. Because of the ongoing nature of the negligence, it would be
extremely difficult for the jury to divorce Hermes’s suicide from the events leading to his
suicide. See id. at 336 (O’Neill, J., dissenting). Furthermore, we agree that the submission
of a question to the jury regarding Hermes’s proportionate responsibility circumvents
section 93.001(a)(2), which provides that the affirmative defense of suicide may not be
asserted if the defendant breaches an applicable legal duty and causes the suicide in
whole or in part. See id.; see also Tex. Civ. Prac. & Rem. Code Ann. § 93.001(a)(2). For
example, if the jury had concluded that Hermes was 51% responsible for the complained-of
injuries and that appellants were 49% responsible, appellants would not be allowed to
assert the affirmative defense of suicide because they were 49% negligent or, in other
words, were negligent in part in causing the suicide. See Tex. Civ. Prac. & Rem. Code
Ann. § 93.001(a)(2). However, in such an event, Hermes would be precluded from
recovering, despite the jury’s conclusion that appellants were 49% negligent in the matter,
because his negligence exceeded 50%. See id. § 33.001. Essentially, appellants would
be insulated from liability and ostensibly given a second chance at asserting suicide as an
affirmative defense if Hermes’s proportionate responsibility is submitted, both of which
contravene the Legislature’s intent in promulgating chapter 33 and section 93.001(a)(2). 
See Dowell, 262 S.W.3d at 336 (O’Neill, J., dissenting).
          Regardless of which approach is applied in this matter, we arrive at the same
conclusion. There is no evidence that Hermes took any “actions apart from the act of
committing suicide” that violated an applicable standard of care. See id. at 332. Nurse
Bergado and Doctor Tavarez both testified that Hermes was “alert and oriented” and
followed their instructions for treatment. See Jackson, 221 S.W.3d at 654 (holding that a
patient has a duty to cooperate with treating physicians, including cooperating in both
diagnosis and treatment); see also Elbaor v. Smith, 845 S.W.2d 240, 245 (Tex. 1992)
(same). Moreover, there is no evidence in the record clearly expressing Hermes’s thoughts
regarding the suicide; therefore, we cannot be certain whether Hermes’s suicide was an
intentional act or solely the result of Hermes’s descent into madness that was partially
caused by the negligence of appellants’ employees; or, in other words, we cannot separate
Hermes’s suicide from the events leading to his suicide. See Dowell, 262 S.W.3d at 334
(O’Neill, J., dissenting) (citing Int’l & Great N. R.R. Co. v. White, 103 Tex. 567, 131 S.W.
811, 812 (1910) (holding that a witness may not testify as to what a deceased person
would have done because such testimony is mere speculation)). 
          Therefore, based on the foregoing, we would conclude that it was error to submit
Hermes’s proportionate responsibility once the jury rejected appellants’ suicide affirmative
defense. See Tex. R. Civ. P. 277 (requiring that apportionment questions be submitted to
the jury in broad form); see also Romero v. KPH Constr., Inc., 166 S.W.3d 212, 215 (Tex.
2005) (“But broad-form submission [of apportionment questions] cannot be used to put
before the jury issues that have no basis in the law or the evidence.”). Despite this
conclusion, appellees have not adequately explained how the submission of Hermes’s
proportionate responsibility harmed them. See Tex. R. App. P. 38.1(i), 44.1. Specifically,
appellees have failed to explain how the jury’s damage award and proportionate
responsibility calculations would change given the erroneous submission of Hermes’s
proportionate responsibility. Without clearly articulating the harm caused by the improper
submission, we cannot conclude that the jury’s verdict was improper. See Dowell, 262
S.W.3d at 331 (Wainwright, J., concurring) (stating that “[a] reviewing court may reverse
and remand for a new trial based on alleged error in a jury charge only if such error was
reasonably calculated and probably did cause the rendition of an improper judgment”)
(internal quotations omitted) (citing Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 843
(Tex. 2005); Reinhart v. Young, 906 S.W.2d 471, 473 (Tex. 1995); Island Recreational
Dev. Corp. v. Republic of Tex. Sav. Ass’n, 710 S.W.2d 551, 555 (Tex. 1986)). Accordingly,
we overrule appellees’ first cross-issue. 
IV. Sections 74.301 and 74.303—The Statutory Damage Caps
          By their second cross-issue, appellees argue that the trial court erroneously
imposed the damage cap of $250,000, as provided in section 74.301(b) of the civil practice
and remedies code, as opposed to the damage cap found in section 74.303. See Tex. Civ.
Prac. & Rem. Code Ann. §§ 74.301(b), .303. Specifically, appellees assert that because
their claims are wrongful death and survival actions based on a health care liability claim,
section 74.303 rather than section 74.301(b), the damage cap applicable to ordinary health
care liability claims, applies. See Tex. Civ. Prac. & Rem. Code Ann. §§ 74.301(b), .303. 
Appellants counter by arguing that the trial court correctly applied the $250,000 non-economic damage cap of section 74.301(b). See id. § 74.301(b). Appellants further argue
that the plain language and legislative history of section 74.301(b) prove that the $250,000
non-economic damage cap applies to all health care liability actions, including wrongful
death actions. See id. 
A.       Standard of Review
          In analyzing appellees’ second cross-issue, we must resort to the rules of statutory
interpretation. Matters of statutory interpretation are questions of law, over which we
exercise de novo review. Tex. Dep’t of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex.
2002). The primary rule of statutory construction is that a court must look to the intent of
the Legislature and must construe the statute so as to give effect to that intent. See Tex.
Gov’t Code Ann. § 312.005 (Vernon 2005); see also Lee-Hickman’s Invs. v. Alpha Invesco
Corp., 139 S.W.3d 698, 700 (Tex. App.–Corpus Christi 2004, no pet.) (per curiam) (citing
City of Austin v. L.S. Ranch, Ltd., 970 S.W.2d 750, 752 (Tex. App.–Austin 1998, no pet.)). 
It is a rule of statutory construction that every word of a statute must be presumed to have
been used for a purpose, and each sentence, clause, and word is to be given effect if
reasonable and possible. See Tex. Workers’ Comp. Ins. Fund v. Del Indus., Inc., 35
S.W.3d 591, 593 (Tex. 2000) (citing Perkins v. State, 367 S.W.2d 140, 146 (Tex. 1963));
see also Cameron v. Terrell & Grant, Inc., 618 S.W.2d 535, 540 (Tex. 1981). Likewise,
every word excluded from a statute must also be presumed to have been excluded for a
purpose. See Cameron, 618 S.W.2d at 540. In addition, we do not view disputed portions
of a statute in isolation. Del Indus., Inc., 35 S.W.3d at 593 (citing Bridgestone/Firestone,
Inc. v. Glyn-Jones, 878 S.W.2d 132, 133 (Tex. 1994)). We are to discern legislative intent
from the plain meaning of the words of the statute. See Alpha Invesco Corp., 139 S.W.3d
at 700 (citing L.S. Ranch, Ltd., 970 S.W.2d at 752).
B.       Applicable Law
          Section 74.301(b) provides that:
In an action on a health care liability claim where final judgment is rendered
against a single health care institution, the limit of civil liability for non[-]economic damages inclusive of all persons and entities for which vicarious
liability theories may apply, shall be limited to an amount not to exceed
$250,000 for each claimant.
Tex. Civ. Prac. & Rem. Code Ann. § 74.301(b). On the other hand, section 74.303 states
that:
(a) In a wrongful death or survival action on a health care liability claim where
final judgment is rendered against a physician or health care provider, the
limit of civil liability for all damages, including exemplary damages, shall be
limited to an amount not to exceed $500,000.00 for each claimant,
regardless of the number of defendant physicians or health care providers
against whom the claim is asserted or the number of separate causes of
action on which the claim is based.
(b) When there is an increase or decrease in the consumer price index with
respect to the amount of that index on August 29, 1977, the liability limit
described in Subsection (a) shall be increased or decreased, as applicable,
by a sum equal to the amount of such limit multiplied by the percentage
increase or decrease in the consumer price index, as published by the
Bureau of Labor Statistics of the United States Department of Labor, that
measures the average changes in prices of goods and services purchased
by urban wage earners and clerical workers’ families and single workers
living alone (CPI-W: Seasonally adjusted U.S. City Average-All items),
between August 29, 1977, and the time at which damages subject to such
limits are awarded by final judgment or settlement.
(c) Subsection (a) does not apply to the amount of damages awarded on a
health care liability claim for the expenses of necessary medical, hospital,
and custodial care received before judgment or required in the future for
treatment of the injury.
Id. § 74.303(a)-(c).
          The crux of this issue is whether what seems to be the more general provision,
section 74.301(b), or the more specific provision, section 74.303, applies. See
Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 901 (Tex. 2000) (determining that
the judgment cap provisions of section 11.02 of former article 4590i prevail over the
general pre-judgment interest provisions of article 5069-1.05); cf. Tex. Gov’t Code Ann.
§ 311.026 (Vernon 2005) (providing that, when construing code provisions that are
irreconcilable, “the special or local provision prevails as an exception to the general
provision, unless the general provision is the later enactment and the manifest intent is that
the general provision prevail”). On appeal, neither party cites any case law addressing the
interplay between sections 74.301(b) and 74.303; however, in researching this issue, we
were able to find one case from the Amarillo Court of Appeals addressing this precise
issue. See THI of Tex. at Lubbock I, LLC v. Perea, No. 07-08-0359-CV, 2010 Tex. App.
LEXIS 5980, at **90-103 (Tex. App.–Amarillo July 28, 2010, no pet. h.).



          In Perea, the appeals court stated the following:
We find no cases which directly decide this issue [the interplay between
sections 74.301(b) and 74.303]. However, because the two statutory
provisions do not conflict on their face, in order to give full effect to the intent
of the Legislature, we see no reason why one cap should apply to the
exclusion of the other cap. Neither the express wording of the applicable
statutes, nor their legislative history indicates that the Legislature intended
anything other than to apply both caps. Therefore, we conclude that both
caps can be applied, and should be applied.
Id. at **97-98. 
          The plain language of section 74.301(b) limits a health care provider’s civil liability
for non-economic damages at $250,000 per claimant, while section 74.303 limits the health
care provider’s total civil liability, including economic and non-economic damages but
excluding “necessary medical, hospital, and custodial care” costs, at $500,000 per
claimant. We agree that both section 74.301(b) and section 74.303 can and should be
applied together. See id. at **97-98.
          In any event, appellees have not argued that the statutes are in conflict. Instead,
they argue that, by including the “wrongful death and survival action on a health care
liability claim,” the Legislature intended to apply the section 74.303 cap to such claims,
while the section 74.301(b) cap applies to “common[-]law negligence health care liability
claims.” In applying section 74.303, as explained by appellees, the trial court’s damage
award should have been $1,788,325 rather than $728,980.98.


 We disagree. Because
sections 74.301(b) and 74.303 can and should be read together, see id. at **97-98, we
cannot say that section 74.303 applies solely to the exclusion of section 74.301(b) in this
case. Furthermore, appellees have not cited to any authority directly on point. 
          In addition, several commentators, after reviewing the statutes and transcripts of the
hearings on the Tort Reform Act of 2003, commonly known as House Bill 4, have
expressed that the Legislature intended for “the wrongful death cap” to be “an aggregate
cap on all damages. Thus, section 74.303 will apply secondarily to any cap on non-economic damages. Therefore, any damage award will be limited by applying the non-economic damage cap in section 74.301, and then will further be limited by applying the
total cap of section 74.303.” Jeff Watters, Better to Kill than to Maim: The Current State
of Medical Malpractice Wrongful Death Cases in Texas, 60 Baylor L. Rev. 749, 760
(2008); see Michael S. Hull et al., House Bill 4 and Proposition 12: An Analysis with
Legislative History, Part Three, 36 Tex. Tech L. Rev. 169, 175, 243 n.464 (2005) (stating,
after consulting with Former Chairman of the Texas Senate Robert L. Duncan and Former
Chairman of the Texas House of Representatives, Joseph M. Nixon, that “[a]s an
aggregate cap on all damages, the wrongful death and survival action cap will apply
secondarily to any cap on non[-]economic damages. Therefore, any damage award will
be limited by applying the non[-]economic damage cap, and then will be further limited by
applying the total cap in cases where it applies. . . . Nothing in the Act forces the
defendant to choose one cap to the exclusion of any other caps that might also apply.”). 
          Based on the foregoing, we believe that the Legislature intended for the wrongful
death and survival action cap, section 74.303, to apply secondarily to the cap on non-economic damages, section 74.301(b), especially considering that appellees’ wrongful
death and survival claims arose out of a health care liability claim. See Tex. Civ. Prac. &
Rem. Code Ann. §§ 74.301(b), 74.303; see also Tex. Gov’t Code Ann. § 312.005; Alpha
Invesco Corp., 139 S.W.3d at 700; L.S. Ranch, Ltd., 970 S.W.2d at 752. We do not
believe that section 74.303 should be read to the exclusion of section 74.301(b). See Tex.
Civ. Prac. & Rem. Code Ann. §§ 74.301(b), 74.303. 
          In this case, the trial court did not award any of the five claimants more than
$250,000 in non-economic damages individually. In fact, the sum total of non-economic
damages awarded to the claimants was $250,000. This figure comports with section
74.001(a)(2)’s requirement that “all persons claiming to have sustained damages as the
result of the bodily injury or death of a single person are considered a single claimant” and
the $250,000 damage cap provided in section 74.301(b). See id. §§ 74.001(a)(2) (Vernon
2005), 74.301(b); see also Perea, 2010 Tex. App. LEXIS 5980, at **93-95 (concluding that
for purposes of applying the health care liability damage caps, the estate of the deceased
and the deceased’s four sons all constituted one claimant). We cannot say that the trial
court erred in applying the damage cap provisions provided in sections 74.301(b) and
74.303. See Tex. Civ. Prac. & Rem. Code Ann. §§ 74.301(b), 74.303. Accordingly, we
overrule appellees’ second cross-issue.
V. Conclusion
          Because we have overruled all issues and cross-issues on appeal, we affirm the
judgment of the trial court.
 
 ROGELIO VALDEZ
                                                                           Chief Justice
 

Delivered and filed the 
30th day of September, 2010.